SARA B. MAY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (High View Nursing, Inc., d/b/a Highview Nursing Center, Appellee).

Third District (Industrial Commission Division)   No. 3—88—0831WC

Opinion filed February 6, 1990.—Rehearing denied April 17, 1990.

Richard E. Grawey, of Peoria, for appellant.

Gary J. Ferrari, of Goldsworthy, Fifield & Hasselberg, of Peoria, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Sara B. May, the claimant, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*), for injuries she sustained in the course of her employment for the respondent, High View Nursing, Inc., d/b/a Highview Nursing Center. An initial arbitration hearing on the claimant's application was held on November 15, 1984, and at the close of the hearing, Arbitrator Metts determined that the claimant's accidental injuries arose out of and in the course of her employment and that her condition of ill-being was causally connected to her work accident of January 15, 1984, and he awarded the claimant temporary total disability (TTD) for 30³/₇ weeks. Arbitrator Metts denied the claimant's request for payment of the Institute of Physical Medicine and Rehabilitation's (the Institute's) bills, finding that these expenses were violative of the two-doctor rule of section 8(a)(3) of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.8(a)(3)). The arbitrator further held that the claimant's condition had not yet reached a state of permanency and that his decision did not bar further hearings on additional TTD or for determining the permanency of the claimant's condition. Arbitrator Metts' written decision of this hearing, entered on April 23, 1985, was not appealed by either party and became a final decision of the Industrial Commission pursuant to section 19(b) of the Workers' Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(b)).

Subsequently, a second arbitration hearing was held on December 3, 1985, by Arbitrator Metts to determine if an additional TTD award or an award for permanent disability should be entered. After this hearing and before a decision was rendered, Arbitrator Metts retired. A third arbitration hearing, conducted by Arbitrator Preibus, was held on May 14, 1986. After considering the evidence presented at the hearing of December 3, 1985, before Arbitrator Metts, and the evidence presented before him on May 14, 1986, Arbitrator Preibus determined that as of November 16, 1984, the claimant was permanently and totally disabled and that her disability was causally connected to her work accident of January 15, 1984. Arbitrator Preibus also found that the respondent was liable for the claimant's medical expenses incurred at the Institute after November 15, 1984. The respondent appealed Arbitrator Preibus' decision to the Industrial Commission, whereupon the Industrial Commission reversed the arbi-

trator's decision and denied the claimant any benefits subsequent to the first arbitration hearing of November 15, 1984. The Commission determined that the claimant had failed to prove that her condition of ill-being was causally connected to her work accident and that the claimant was not credible in her statements to her treatment providers or in her testimony. The Commission also reversed Arbitrator Preibus' decision regarding the respondent's liability for the bills incurred at the Institute, finding that the doctrine of *res judicata* was applicable to Arbitrator Metts' decision on this issue. On review, the circuit court confirmed the Industrial Commission's decision, and the claimant appeals.

On appeal, the claimant raises three issues. Her first issue is that the Industrial Commission's (Commission's) determination that her condition was not causally connected to her work-related injury was erroneous. Her contention of this issue is threefold: First, that since the medical and psychological evidence of the causal connection of the claimant's disability to her work-related accident was unrefuted by the respondent, the Commission's decision was erroneous as a matter of law. Next, the claimant contends that the doctrine of *res judicata* was applicable to Arbitrator Metts' determination that her condition was causally connected to her work accident, as that decision was not appealed by either party and became a final decision of the Commission. The claimant also argues that the Commission's finding that she failed to prove a causal connection between her disability and her work-related injury was against the manifest weight of the evidence.

The claimant's remaining two issues on appeal are that the Industrial Commission erred when it failed to award penalties pursuant to sections 19(k) and 19(*l*) and attorney fees pursuant to section 16 of the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, pars. 138.19(k), 138.19(*l*), 138.16), and that the Commission erred when it held the doctrine of *res judicata* applied to Arbitrator Metts' determination that the Institute's expenses were noncompensable by the respondent as the Institute provider was a third medical provider and in violation of the two-doctor rule of section 8(a)(3) of the Workers' Compensation Act. In lieu of setting forth a statement of the facts at this juncture, a recitation of pertinent facts will be given under the consideration of the issues.

■ In considering the claimant's issue that the Commission erred in its determination that she failed to prove a causal connection between her disability and her work-related accident, we initially address her argument that the doctrine of *res judicata* was applicable to Arbitrator Metts' determination of this issue. The substance of her ar-

gument is that as Arbitrator Metts' decision of April 23, 1985, was not appealed, that order became a final determination of the Commission; and, therefore, the Commission had no jurisdiction to consider the issue of causal connection in a subsequent hearing. The respondent contends that the claimant waived this issue, as she failed to raise it before the circuit court and has raised it for the first time on appeal. A transcript of the hearing before the circuit court was not included in the record on appeal; however, the parties' briefs to the circuit court are contained therein. A perusal of the claimant's brief reveals that she did not present the issue of *res judicata* in her brief, but confined her argument in that document to contending that the Commission's determination that there was no causal connection between her disability and her work-related accident was against the manifest weight of the evidence. Because this issue was not presented to the circuit court and is presented for the first time on review, we find this issue has been waived and need not be considered by this court. *Allis-Chalmers Manufacturing Co. v. Industrial Comm'n* (1966), 35 Ill. 2d 367, 220 N.E.2d 181; *Chambers v. Industrial Comm'n* (1985), 139 Ill. App. 3d 550, 487 N.E.2d 1142.

We next consider whether the Industrial Commission's determination that the claimant failed to prove her disability was causally connected to her work-related injury of January 15, 1984, was against the manifest weight of the evidence. At the arbitration hearing of November 15, 1984, the claimant testified that she had worked as a nurse's aide for respondent since August 17, 1981, and that she was so employed on January 15, 1984. On that date, at approximately 10:30 p.m., a male aide asked for her assistance in putting a patient into bed. The patient was violent and kicked the claimant several times in the head, neck and ears. The claimant reported this incident to the nurse and then sat, without performing any other duties, until 11 p.m., when her work shift ended. The claimant stated that immediately after she was kicked, she became dizzy and nauseated, she developed a headache, her face became very hot, and her neck hurt. When she got home that night, she took a bath and two aspirin and went to bed. When she awoke the next morning, her head was sore, her ears and neck hurt, and her symptoms had not abated. That day, the claimant did not go to work, but she instead saw her physician, Dr. Maude Sanders. Dr. Sanders had X rays taken, advised her to rest in bed for two weeks and prescribed muscle relaxants.

The claimant returned to work on January 30, 1984, but she did not feel well. Although her symptoms persisted, she worked until March 7, 1984, whereupon, she stopped working and remained off

work until March 25, 1984.

After March 25, 1984, the claimant resumed working and continued to work until May 18, 1984. On that date, the claimant testified that she lifted a patient into bed out of a wheelchair, and after she did this, she "passed out." The claimant regained consciousness without anyone coming to her aid since the door of the patient's room was closed. After this incident, the claimant left work and she again consulted with Dr. Sanders as her symptoms of dizziness, headaches, numbness of her hands and feet, nausea, and loss of memory persisted. Dr. Sanders referred her to Dr. McLean on May 21, 1984. The claimant did not return to work after May 18, 1984.

The claimant saw Dr. McLean, a neurologist, who subsequently referred her to Dr. Patel at the Methodist Hospital for physical therapy. At Dr. Patel's direction, the claimant received physical therapy for about six weeks. Dr. McLean also referred the claimant to Dr. Teichmann, a psychologist, on August 7, 1984, for an evaluation and tests, but later in October of 1984, Dr. McLean referred her to Dr. Teichmann for counseling. Dr. McLean further referred her to Dr. Brad Colen, a psychiatrist, in August of 1984. At the respondent's request, the claimant also saw Dr. Collins on October 19, 1984. The claimant continued to see Dr. McLean, but she no longer saw Dr. Sanders.

The claimant testified before Arbitrator Metts that she continued to have headaches, to have dizzy spells, to feel nauseated, to feel her face become hot, to become unbalanced, to have pain and problems with her neck, and to become angry and depressed. Because of her dizziness and her headaches, she was unable to do her household chores. She was taking medication to help her sleep and another medication to thin her blood.

On cross-examination, the claimant testified that she had attended college at Mid-State for two years and had received a diploma from there in 1967. Her course work there involved training in clerical and office machines. The claimant had also taken a sociology course in 1979, in which she received a grade of "B." According to the claimant, prior to January 15, 1984, she had had no complaints about her physical condition; however, she admitted that she had had an automobile accident in 1978. At the time of the car accident, the claimant had injured her neck and back, but she had not received any injury to her head. The claimant had seen Dr. McLean in 1979 for problems relating to the car accident, but she did not recall telling the doctor that she was having headaches.

Two letter reports of Dr. Sanders were admitted into evidence.

The first letter, dated April 9, 1984, stated that the claimant had reported being kicked in the head and face at work, and that the next morning she had had headache pain, "tenderness and parathesia [*sic*]" (tingling, numbness and a burning sensation) on her face, head, ear and neck. The doctor's examination of the claimant revealed that the claimant had tenderness over the face, head and ear with some discoloration, that the muscles of the neck were rigid and tender, and that the motion of her head was very painful and limited. The doctor reported that there was no visible pathology, that the claimant's brain scan was normal, and that the X rays of the claimant's cervical spine showed evidence of degenerative disease. The doctor diagnosed the claimant's condition as follows: "Contusion of the left side of the face, head and left ear. Mild brain concussion. Acute cervical muscle strain. Preexisting arthritis of the cervical spine due to degenerative disease and multiple narrowed disc spaces." The doctor explained that the symptoms of this type of injury "flare up" or become worse with activity. The doctor concluded that the claimant's absence from work on March 10, 1984, to March 25, 1984, was related to her injury of January 15, 1984.

Dr. Sanders, in her second letter report of June 25, 1984, disclosed that the claimant had the same physical findings as in her April letter, and she explained that the problems became severe the day following the claimant's accident and continued until the present time. She referred the claimant to Dr. McLean, a neurologist, for the headaches, and to Dr. McKnight, an autolaryngolist, for her ear problems, as these discomforts had remained persistent. The doctor again acknowledged that the claimant's test results, *i.e.*, the brain scan and the encephalogram, were normal and that the X rays revealed the degenerative disease of the cervical spine. Her diagnosis of the claimant's condition remained the same. The doctor stated that the claimant had worked irregularly and with difficulty, and that this activity had aggravated her symptoms. The doctor concluded by stating: "Although the degenerative changes in the cervical spine could be a potential source of this type of problem [headaches, ear problems, parasthesia], it is my opinion that the injury [of January 15, 1984] initiated these symptoms which she was not having at the time of the accident. She has not improved as rapidly as expected. At the present time, I feel that she may be disabled and may require further treatment. I can not determine at this time."

Another report dated October 19, 1984, from Dr. Eugene Collins, who the claimant saw at the respondent's request, stated that the claimant advised the doctor that she was on an antidepressant medi-

cation and on a blood thinner medication, but she was unable to recall the names of these medications. The claimant told the doctor of her accident at work and her symptoms after the accident. These symptoms were identical to those reported to Dr. Sanders. The claimant told Dr. Collins that she had had a CT scan (computerized axial tomography), an EEG (electroencephalogram), and the appropriate X rays, the results of which were all within normal limits. Dr. Collins conducted a neurological examination of the claimant and found no neurological deficits. The doctor concluded in his report as follows: "On the basis of the history and the exam I feel her symptoms are most compatible with a post traumatic syndrome with a possible flexion/extension cervical ligamentous component. In general, in many cases after one sustains blunt head trauma a series of symptoms such as lightheadedness, personality change, blurring of vision, headaches, etc., appear and are felt to be on a post-traumatic basis. Neurological exam and appropriate tests are usually unrevealing. These symptoms usually resolve in time, but in some cases take several months to over a year to do so."

The evidence deposition of Dr. John McLean, a neurologist, was admitted into evidence. He testified that he had originally seen the claimant in 1979, but that he saw her for her current problem for the first time on May 21, 1984. At that time, the claimant complained of headaches, of back and neck pain, and of dizziness and passing out. The doctor's neurological examination of the claimant revealed no neurological deficits. Dr. McLean had a CT scan, an EEG, an EMG (electromyogram), and a nerve-conduction test performed on the claimant, the results of which were normal.

Dr. McLean subsequently saw the claimant on May 29, June 26, August 6, August 28, September 12, and October 29, 1984, and at each of these visits the claimant's symptoms remained the same. At the visit on September 12, 1984, the doctor recommended that the claimant see Dr. Colen, a psychiatrist. Dr. McLean prescribed physical medicine rehabilitation therapy, an antidepressant medication and psychiatric therapy for the claimant.

At the claimant's initial visit of May 21, 1984, the doctor diagnosed the claimant's condition as "postconcussion type syndrome," as her initial diagnosis was a concussion and "she had an emotional reaction to her accident [of January 15, 1984]." The doctor explained that physically the claimant's nerves and muscles were "okay," but that she was disabled because she was emotionally unable to work. He had no opinion as to whether the claimant would be having her current problems had she not been kicked in the head. The claimant remained

under his care and was being followed by Dr. Colen.

On cross-examination, Dr. McLean testified that he had seen the claimant in 1979 following a car accident in which she had been involved. After the car accident, the claimant complained of neck pain and low back pain. The doctor admitted that the claimant had some muscular problems; however, the doctor found no neurological deficit. Dr. McLean believed that the claimant's problem was "largely functional," *i.e.*, that it was an "emotional overlay," and recommended that the claimant have an MMPI done. In Dr. McLean's opinion, if a person had a previous functional overlay problem, a physical injury or trauma could aggravate that condition.

From this evidence, Arbitrator Metts found that the claimant had had an emotional reaction to her accident of January 15, 1984, and that she was temporarily totally disabled as a result of this condition. Arbitrator Metts awarded her TTD for 30³/₇ weeks. The arbitrator denied her medical expenses for the Institute, finding that the Institute was the claimant's third choice of medical provider. Therefore, Arbitrator Metts determined that under the two-doctor rule of section 8(a) of the Workers' Compensation Act, the respondent was not liable for the Institute's bills.

At the second hearing before Arbitrator Metts on December 3, 1985, the claimant testified that she had remained off work since her last hearing on November 15, 1984. According to the claimant, she had another blackout episode on November 28, 1984, when she went outside to feed her dog. When she passed out, she fell and hurt her right hip and her back. She stated she had passed out on approximately four other occasions since May 18, 1984.

The claimant's current subjective complaints were dizziness; emotionalism; a fear of people, especially old, sick persons; confusion; headaches; considerable ear problems; and memory problems; and that these problems recur daily. Because of these problems, the claimant was unable to do her food shopping, and friends and her son helped her with her household chores.

The claimant stated she took medication, but she was unable to recall the name of the medication. The claimant testified that Dr. Szymke recommended that she walk and do daily back exercises. Dr. Szymke had also prescribed a wrist splint and a back brace for her. Through Dr. Szymke, the claimant had been involved in physical therapy five days a week from August 27, 1985, through October 30, 1985. When queried as to other doctors she had seen since the November arbitration hearing, the claimant stated that she was under the care of Dr. Szymke and Dr. Teichmann, and upon Dr. Teichmann's

referral, she was now under the care of Dr. Ward.

The claimant testified that she currently did volunteer work for one hour per week for the Catholic Concern Office. This volunteer work entailed distributing bags of unprepared foods to persons out of work, wherein the people gave her a ticket and then took a bag of food.

A letter report of Dr. Weinstein dated April 15, 1985, stated that he saw the claimant on that date. He reported that the claimant's subjective complaints were "bilateral hearing loss, true vertigo with syncopal (fainting) episodes, tinnitus on occasion and blurred vision." His examination of the claimant revealed no visible nystagmus (an abnormal and involuntary movement of the eyeballs either from side to side or up and down), but that the claimant had a slight high frequency hearing loss in her left ear.

A report from the emergency department of the Methodist Medical Center was admitted into evidence to show that on November 28, 1984, the claimant came in for treatment, after she had reportedly blacked out and fell. The claimant complained of pain in her right hip area. The report gave the claimant's diagnosis as "1) [r]ecurrent syncope[, and] 2) [right] hip contusion."

Four evidence depositions were also admitted into evidence. Dr. Dietra Teichmann testified in her deposition of October 1, 1985, that she was employed by the Institute as a specialist in neuropsychology, which she explained was the study of behavior as it related to the way the brain functions. Part of her duties with the Institute was to do "cognitive retraining" following a head injury. According to Dr. Teichmann, after a head injury, a person suffers with problems of long- and short-term memory, and has difficulty in reasoning with common, everyday situations, with planning ahead, with problem solving and with being flexible and adaptable. "Cognitive retraining" addresses these problems.

Dr. Teichmann first saw the claimant upon Dr. McLean's referral in August 1984 for a neuropsychological examination. Dr. Teichmann explained that a neuropsychological examination consisted of administering the following tests: a Halstead-Reitan Neuropsychological Battery; a Wechsler Adult Intelligence Scale; a Boston Revision of Wechsler Memory Scale; and a Minnesota Multiphasic Personality Inventory (MMPI). The doctor administered these tests to the claimant, and the results "suggested that there was impairment of adapted skills based on brain functioning, that the impairment appeared to be a generalized impairment as opposed to a localized impairment." In explaining the difference between a localized and a generalized im-

pairment, the doctor stated that a stroke causes localized impairment with specific behavioral consequences, where with a generalized impairment, more of the brain is involved and there is no particular pattern as to where the impairment is located.

After her initial appointment with the claimant for an evaluation, the doctor next saw the claimant on October 3, 1984, when the claimant was again referred to her by Dr. McLean for counseling rather than evaluation. Since October, the doctor had seen the claimant approximately two to three times per month. The doctor's diagnosis of the claimant's condition from the neuropsychological tests suggested impairment of the claimant's brain functioning. Although she did not find "real clear evidence" that this impairment was necessarily related to the claimant's closed head injury, the doctor did not rule that cause out. Dr. Teichmann's treatment of the claimant was for the effects of the head injury, *i.e.*, her memory problems, her poor frustration control, her poor planning skills and her depression. The claimant had also developed a panic reaction to old men who looked sick, and the claimant was becoming more and more withdrawn.

Dr. Teichmann explained that she obtained the claimant's history from the claimant herself and from the claimant's medical records. The claimant had told Dr. Teichmann at the first counseling session that she was having difficulty controlling her anger, that she was on a variety of medications and these medicines interfered with her ability to think clearly, and that she also had headaches, dizziness and problems with her vision and hearing. At the claimant's most recent visit on September 26, 1985, the claimant complained of extreme depression and was withdrawn. When asked her opinion as to the cause of the claimant's condition of ill-being, the doctor stated that the problems for which she was treating the claimant were related to her head injury. In 1984, the doctor had discussed with Dr. McLean the possibility that the claimant's dizziness may be due to a nutritional or a hormonal problem. However, Dr. McLean had checked those possibilities and ruled them out. Likewise, Dr. Teichmann was aware that Dr. McLean had found no neurological deficit to explain the claimant's condition, but the doctor stated that "absence of evidence is not evidence of absence [of injury]."

Dr. Teichmann did not believe the claimant was able to return to work at this time as the claimant lacked the ability to do other forms of work and, for psychological reasons, she was unable to return to her previous type of work. The doctor's reasons for her opinion were that the claimant had a low frustration tolerance; she had long-term and short-term memory problems; she was confused and had lapses in

memory; she had difficulty with paying attention and with her concentration; she had a variety of pain complaints; and she had dizzy spells and panic attacks. These were the same problems that the claimant had had in November of 1984.

Dr. Teichmann was aware that the claimant was doing volunteer work for one hour each week. The doctor had suggested this to the claimant as part of her treatment, and had encouraged her to find some sort of activity to get her out of the house so as to make a start in breaking the cycle of depression. The doctor stated that the claimant had also applied for admission to the Easter Seals Independent Living Skills Training Program, but that the claimant was denied admission because of her age. The program was seeking young persons, and the claimant did not qualify.

The doctor was aware and had access to the claimant's records regarding her car accident in 1978; however, she could not recall whether she obtained or requested the claimant's records of 1979. She was unaware and unfamiliar with the claimant's records in which it was recommended that the claimant be administered an MMPI. The doctor admitted that knowledge of a person's prior psychological problems would help in reaching a diagnosis or an opinion.

Dr. Szymke's and Dr. Higgins' evidence depositions were also introduced into evidence. Dr. Szymke, a doctor who worked at the Institute and specialized in the field of physical medicine and rehabilitation, had commenced his treatment of the claimant on March 15, 1985, for her physical complaints resulting from a fall. Dr. Szymke's neurological examination of the claimant revealed no neurological deficits; however, the doctor diagnosed the claimant's condition as an irritation of the joints in her back and a loss of mobility because the soft tissue in her back was shortened as a reaction to the joints' irritation. The doctor's prescribed treatment for the claimant was a home program of exercises, including walking, and a lumbrosacral brace.

The doctor saw the claimant approximately once a month for several months, and during this time, the claimant's flexibility and range of motion improved. The doctor stated that in order for the claimant's condition to improve, she had to have worked on her own to accomplish this and she did so. Dr. Szymke found the claimant's condition compatible with her history of falling and injuring her back, and in his opinion, her rehabilitation treatment was causally related to her accident of January 15, 1984. The doctor explained that it was possible for a person to have an injury and that there would be no objective findings of the injury on X rays or an EMG.

Dr. Szymke admitted that his opinion was based on the truth and

veracity of the claimant as to her history and upon her medical records. The doctor was unaware that the claimant was in an automobile accident in 1978; however, he stated that he had no reason to doubt the claimant's honesty. Likewise, his opinion and diagnosis were not based solely upon the claimant's subjective complaints, but his diagnosis was also the result of his examination of her, for "during my exam if two or more, preferably three very different maneuvers cause what I would predict to be the appropriate response[,] then I have a basis to make the diagnosis." The doctor stated that if he knows certain maneuvers are going to hurt the claimant and they do not, then he would question her veracity. In the doctor's opinion, the claimant was not yet able to engage in gainful employment.

Dr. Higgins' deposition of October 25, 1985, established that he was a chiropractor and that the claimant first came to his clinic on April 11, 1984. Although she was initially seen by Dr. Oatman, the claimant's treatment was under Dr. Higgins' supervision, and upon Dr. Oatman's departure from the clinic in July of 1984, Dr. Higgins took over her treatment. Dr. Higgins diagnosed the claimant's condition and treated her for a trauma to her cervical spine, which produced a sprain/strain to the supporting structure.

Dr. Higgins was aware of the claimant's car accident of 1978, and that she had complained of neck pain, headaches, back pain and dizziness for a year after the accident. However, he stated that the claimant was released as asymptomatic from the injuries sustained in the car accident.

The doctor was unaware that the claimant was being seen by a neurologist during his treatment of her or that Dr. McLean had found no neurological deficits to exist. He did know that the claimant had undergone an EMG and a nerve-conduction test, but he did not obtain the results of the tests.

Lastly, the deposition of Dr. James Ward, a psychiatrist, taken on November 1, 1985, was admitted. Dr. Ward testified that the claimant was referred to him by Dr. Teichmann and that he saw the claimant for the first time on April 17, 1985, for an evaluation. The claimant told him of her work accident, of her treatment by her family doctor, and of her time off and on work. The claimant stated to him that she had changed after the accident in that she had loss of memory, became angry at people, was nervous and dizzy, was unable to sleep well, and mentally recalled the accident frequently. The doctor did not think that the claimant was psychotic. He tested the claimant's intellectual abilities and found that her ability to calculate was poor, *e.g.*, she was unable to subtract 7 from 100 even though she had had some

college education. The doctor did not believe that the claimant was malingering. The doctor's provisional diagnosis was that the claimant was suffering from a post-traumatic stress disorder which had lasted over a period of six months, the difference between acute and chronic.

The claimant was again referred to Dr. Ward on September 27, 1985, by Dr. Teichmann. The claimant told the doctor of her other therapeutic efforts; that she had seen Dr. Szymke, Dr. Teichmann, and Dr. McLean, and that she had gone to vocational rehabilitation. On this occasion, the doctor prescribed an antidepressant medication for the claimant. His diagnosis of the claimant remained the same, *i.e.*, that the claimant had a post-traumatic stress disorder with some affective components (depression). The claimant advised the doctor that she wanted to cry, that her blood pressure had gone up, that she had ringing in her ears, and that she had a great deal of anger about her accident. The doctor found that the claimant's most significant diagnostic piece of history was her frequent recall of her accident of January 1984, and that her symptoms were compatible with his diagnosis. Dr. McLean's diagnosis was based upon the claimant's closed head injury. The doctor did not know the physical impact of the injury, but he based his diagnosis upon the claimant's depression, her agitation, and her frequent and recurrent memory of the accident. The doctor was primarily treating the claimant's depression, and he found the "depressive aspects to which I am addressing myself are related to the instant of January 1984."

The doctor admitted that in obtaining a history of the claimant he relied on her truthfulness. He was unaware that Dr. McLean had recommended an MMPI for the claimant in 1979. The doctor stated that a prior MMPI might have an impact on his assessment of the claimant in that this test would show her "vulnerability" to her accident of January 1984; however, he still thought that the causal relationship between the claimant's present symptoms and the accident of January 1984 would be the same. By using the word "vulnerability," the doctor explained that he meant a predisposition to have an emotional reaction to an injury.

Dr. Ward was aware that Dr. Teichmann had had psychological tests performed upon the claimant, and he thought the results might be helpful; however, he admitted that he did not have the results forwarded to him, as he usually does not obtain that type of information. Dr. Ward also did not find the fact that the claimant returned to work significant as the periods of work were of relatively short duration.

The claimant's last arbitration hearing was held on May 14, 1986,

before Arbitrator Preibus. At the May arbitration hearing, the claimant testified that she had not returned to work since May 18, 1984. When asked what doctors she currently was under the care of, the claimant stated that she saw Dr. McLean, Dr. Teichmann, Dr. Ward and Dr. Kessler. These various doctors had prescribed medication for her sleeplessness, medication for her high blood pressure, Antivert for dizziness, and had prescribed a back brace which she wore. Her medications for sleeplessness and high blood pressure remained at Walgreens, as she lacked sufficient funds to purchase them. The claimant's current subjective complaints, from which she suffered daily, consisted of dizziness, head pain, confusion, depression, extreme anger, and ear and neck pain.

The claimant testified that because she was unable to do her own house work, her son and her friends help her. She also has a daughter who lives in Minnesota.

The claimant was advised by Dr. Teichmann to get out of the house and to socialize with people, and the claimant tried to comply with this suggestion. She had also been advised by another doctor to get out and walk, and she continued to try to do this.

According to the claimant, she never had a head injury prior to her work accident of January 1984. She admitted she had a car accident in 1978, but she only suffered from strained muscles in her back as a result of that accident.

The remaining evidence presented at the arbitration hearing of May 1986 consisted of two letter reports and the reintroduction of Dr. John McLean's evidence deposition which was admitted into evidence at the arbitration hearing of November 15, 1984. The letter report from Dr. Teichmann dated April 5, 1986, stated that she agreed with Dr. Ward's diagnosis of the claimant's condition as post-traumatic stress disorder, chronic, with affective components. The other letter report dated May 12, 1986, from Dr. Ward reiterated that the claimant continued to suffer from post-traumatic stress disorder.

After considering the record of the arbitration hearing of December 3, 1985, and the evidence presented at the hearing of May 15, 1986, Arbitrator Preibus found that the claimant's disability of post-traumatic stress disorder, which became permanent on November 16, 1984, had rendered her permanently and totally disabled, and that her condition was causally connected to her work accident of January 15, 1984, thereby entitling the claimant to benefits for life. Additionally, Arbitrator Preibus found that the medical expenses flowing from the Institute and any referrals coming therefrom were properly payable by the respondent, with the exception of those payments to the Insti-

tute which were previously disallowed by Arbitrator Metts in his decision of April 23, 1985.

The respondent appealed Arbitrator Preibus' decision to the Industrial Commission, and the hearing on review was held on June 18, 1987. At the review hearing, the respondent introduced into evidence three reports of physical stress tests (a treadmill test, an exercise test, and a Thallium scan) which were done when the claimant complained of chest pains in 1986. The respondent also introduced the notes of Dr. Kessler's visits with the claimant. The doctor's notes of the claimant's visit on March 17, 1986, indicated that the doctor found the claimant to be suffering from hypertension and gave her one month of samples of Capoten for this condition. Subsequent visits by the claimant on June 16, July 17, August 20, and September 15, 1986, indicated that the claimant did not always strictly comply with taking her blood pressure medication, frequently taking two pills a day instead of taking the prescribed three pills a day, and sometimes forgetting to take the medication altogether. In the doctor's notes of June 16, 1986, it was stated that the claimant was "told the importance of this (taking her medication) and the long-term side effects of hypertension if not treated."

Dr. Teichmann's evidence deposition of May 20, 1987, was introduced into evidence. Dr. Teichmann testified that she was a psychologist employed at the Institute, and that she had treated head-injured persons for the past 10 years, during which she had seen approximately 75 to 100 head-injured persons per year. In assessing the deficits a head-injured person may have, she administers a battery of neuropsychological tests, does a diagnostic interview, and reviews the person's medical records. She followed this procedure with the claimant.

Dr. Teichmann described a closed head injury as one in "which the skull bone is not fractured. When there is an impact, the brain reverberates within the skull and because the skull is not fractured, the brain absorbs the impact. The fluid surrounding the brain provides some cushioning but the brain still reverberates. There's a point of impact, there's a counterpoint of impact and there's usually some rotational forces and a lot of bruising and tearing within the brain structures." She explained that as a result of the tearing and bruising of the brain, a variety of cognitive deficits and intellectual deficits can occur, such as long-term and short-term memory deficits, sensory and motor deficits, reasoning deficits, and planning and judgment deficits. Along with the cognitive deficits, physical symptoms such as dizziness, hearing problems, and sometimes speech, swallowing and

breathing problems can occur. She stated that a person can have a brain injury and the results of objective tests such as a CT (computerized axial tomography) scan and an MRI (magnetic resonance imaging) can be normal.

Dr. Teichmann testified that the claimant had been referred to her by Dr. McLean, initially for neuropsychological testing and subsequently for counseling. She had seen the claimant two times per month since October of 1984, but since last Christmas had only seen the claimant one time per month. The reason for Dr. Teichmann's decreased visits was because the claimant also was seeing Dr. Ward, a psychiatrist, one time each month.

Dr. Teichmann had observed cognitive deficits in the claimant, consisting of a volatile temper, memory deficits, problems with reasoning and judgment, and a fear of old, sick men with glasses. The claimant had also evidenced signs of depression. Dr. Teichmann had noticed a decline in the claimant's grammar and spelling and had noticed some "blanking out" spells. With regard to the claimant's physical complaints, the claimant continued to suffer back pain, pain in her left arm, ringing in the ears (particularly the left ear), trouble with hearing upon occasion, and occasional blacking-out episodes. The doctor's diagnosis of the claimant's condition was post-traumatic stress disorder and post-concussion syndrome. She based her diagnosis on the claimant's continuing deficits and the definitions of post-traumatic stress disorder and post-concussion syndrome, her personal observations of the claimant, her conversations with Dr. Ward, and evaluations by other medical personnel. It was the doctor's opinion that the claimant's current condition "stems back to her head injury in January of 1984," and that the claimant's current deficits were permanent.

During her years of practice, the doctor had developed the ability to determine if a person was malingering, and it was her opinion that the claimant was not faking her symptoms or malingering. She did not believe the claimant to be employable at this time because of the claimant's decreased stamina and the impairment of her cognitive functioning.

Dr. Teichmann was aware of the claimant's activities and had given the claimant suggestions as to various activities to pursue. The doctor testified that the claimant had made significant improvement after December 1985. On March 22, 1986, the claimant had attended a dinner party at the doctor's suggestion. The claimant had told the doctor on April 18, 1986, that she was helping a friend by running errands, *i.e.*, when the claimant did her grocery shopping and picked up

her mail, she would do so for this friend at the same time. The doctor was aware that the claimant had gone on a cruise with a friend for a week in June of 1986, which was paid for by the claimant's friend. The doctor was aware that the claimant was maintaining her volunteer work and that she was calling friends, visiting people and occasionally having people over to her home. The doctor was told by the claimant on August 29, 1986, that she had increased her activities and that she was visiting with friends, was going shopping, and had gone on a trip to her daughter's home in Minnesota. The claimant's trip to her daughter's home was with a friend, and the claimant was a passenger in the car. Because increasing social activities were behavioral ways of combating depression, the doctor had encouraged the claimant to attempt to do these things as the claimant was becoming more and more withdrawn. However, since last Christmas, the claimant had regressed and had become more depressed, especially as the anniversary date of her injury neared.

Dr. Teichmann was aware that the claimant was not taking her blood pressure medication. The reason for the claimant's noncompliance with the medication was because the claimant lacked sufficient funds to pay for the medication. The doctor had knowledge of the problems that could occur if the medication was not properly taken and cited some of those problems as being headaches, dizziness, and bilateral ringing in the ears.

The claimant testified at the review hearing that her current symptoms were headaches, dizziness, blackouts, loss of memory, extreme anger, and depression. The claimant's neck continued to hurt, and she had constant ringing in her ears. The claimant's dizziness and headaches occurred daily. Additionally, her left arm becomes numb and her fingers become stiff, for which she wears a wrist brace prescribed by Dr. Szymke. She also wears a back brace.

The claimant stated that she continued to be unable to do household chores and that her son and friends helped her. She continued her volunteer work for one hour per week. She had attempted to do additional volunteer work with kindergarten children, but she was unable to tolerate this activity.

The claimant admitted she becomes depressed because of her inability to do as she had previous to her accident of January 1984, and because of her constant pain. She also becomes angry. She testified that she will go into the bedroom to retrieve an article, and once there, she forgets what she went to get. The claimant previously was good at mathematics and at spelling, but now her spelling and mathematics skills are poor, her English is bad, and she can't remember.

The claimant currently sees Dr. Teichmann every other week, Dr. Ward once a month, and Dr. McLean. Dr. Ward prescribed medication for sleeping, and she also takes Ativall and Tofranil. She was supposed to take medication for her high blood pressure, but she was not taking it presently as she had run out of the medication and had insufficient funds to purchase more. The claimant denied that Dr. Kessler told her that if she did not take her blood-pressure medication that she might become dizzy, that her ears could ring, or that she would have headaches. Likewise, she did not have any knowledge of Dr. Teichmann telling her of the problems associated with failing to take her blood-pressure medication.

The claimant admitted that a friend paid for and took her on a week's cruise in June 1986 and that they flew to Florida to catch the cruise. She told of her daughter and grandson coming to visit her from Minnesota, and that a friend of hers drove her, her daughter and her grandson back to Minnesota. The claimant explained that they drove up one day and stayed overnight, and that she and her friend returned home the next day. During questioning of the claimant about this trip, the claimant originally stated that she and her friend drove to Minnesota and returned the same day, but upon reconsideration, the claimant thought that they had stayed the night at her daughter's home. The claimant did not drive during the trip.

The claimant denied telling Dr. Teichmann that she was running errands for her "other friends" and that she was going out and socializing with friends and other persons. She also denied that she invited friends over to her house. However, the claimant stated, "I don't understand the word 'people.' If a friend comes and visit [sic] me, that's fine. That's company for me, but [']people['] you are referring to three, four, five or six, no." The claimant was unable to remember if she had told Dr. Teichmann that she was going to dinner parties or out to eat with her friends. She recalled that the last time she was out to eat was when she was on the cruise.

After hearing the foregoing evidence, the Industrial Commission reversed Arbitrator Preibus' decision and found that the claimant had failed to prove there was any causal connection between her disability and her work accident of January 15, 1984. The Commission found that the claimant lacked candor and that her testimony regarding her inability to purchase her blood pressure medication was impeached by the doctor's records which showed that she had the medication but would forget to take it regularly. The Commission likewise did not find her complaints to her doctors or her testimony of loss of memory or confusion credible. Further, the Commission found the claimant un-

truthful in her denial of her activities and social interactions. The Commission held that the claimant was not disabled as a result "of physical or organic cause related to the accident since that time (November 15, 1984)."

It is well established that it is the province of the Industrial Commission to determine witness credibility and causal connection and that these determinations will not be set aside unless against the manifest weight of the evidence. (*Dean v. Industrial Comm'n* (1986), 143 Ill. App. 3d 339, 493 N.E.2d 16.) It is equally well established that a psychological injury is compensable if it results from an accidental injury. (*Veritone Co. v. Industrial Comm'n* (1980), 81 Ill. 2d 97, 405 N.E.2d 758; *Spetyla v. Industrial Comm'n* (1974), 59 Ill. 2d 1, 319 N.E.2d 40; *Hook v. Industrial Comm'n* (1972), 53 Ill. 2d 245, 290 N.E.2d 890.) In the instant case, although the claimant had initially suffered a physical injury, the medical testimony established that the claimant's current disability was primarily mental. Dr. McLean, Dr. Ward and Dr. Teichmann each testified that the claimant was suffering from post-traumatic stress disorder or post-concussion syndrome and connected her disability to her accident of January 15, 1984. Additionally, even the respondent's expert witness, Dr. Collins, determined that the claimant's symptoms were compatible with a post-traumatic syndrome. The testimony also established that the lack of a neurological deficit for the claimant's condition did not mean that the claimant had not suffered an injury. As Dr. Teichmann succinctly stated, "absence of evidence is not evidence of absence [of an injury]." Additionally, Dr. Teichmann's testing of the claimant revealed that the claimant did have an impairment of her adaptive skills due to her brain functioning, which provided objective evidence of the claimant's disability.

The medical definition of post-concussion syndrome is "[a] complex of symptoms caused by a concussion of the brain ***. It is marked by headache, dizziness, subjective head noises, insomnia, irritability, overreaction to stimuli, etc. Also called *traumatic neurasthenia* and *posttraumatic syndrome*." (Emphasis in original.) (Schmidt's Attorney's Dictionary of Medicine 278-79 (1989).) The claimant's subjective complaints of headaches, dizziness, ringing in her ears, anger, and problems with sleeping were consistent with the definition of post-traumatic syndrome, the diagnosis given by the expert witnesses throughout the record. Further, there is adequate testimony to show that the origin of the claimant's condition was from her physical injury of January 15, 1984, when a patient kicked her in the head causing her to suffer from a mild brain concussion.

While the respondent introduced the medical records of Dr. Kessler which showed that the claimant did not have good compliance with the instructions for her blood-pressure medication, and testimony was elicited that failure to comply with this medication may produce headaches and dizziness, we note that Dr. Kessler's evidence was from 1986, and that the claimant's complaints of dizziness and headaches had been ongoing since 1984, two years prior to when she was prescribed this medication. Further, the evidence that the doctor told the claimant of the importance of taking this medication and the long-range effects of not doing so was vague and did not clearly establish that the claimant was told specifically that failure to take her medication would cause her dizziness and headaches. Dr. Kessler's notes only indicate that she was told the "importance" of taking the medication and the "long-term effects." Likewise, the testimony elicited by the respondent from Dr. Teichmann that noncompliance with blood-pressure medication could cause headaches and dizziness was hypothetical in nature, and the doctor did not determine this to be the cause of the claimant's condition. No other medical evidence was presented by the respondent to show that the claimant's condition was caused by her failure to comply with the medication. The medical evidence presented in this case was more than sufficient to establish the claimant's disability of post-traumatic stress disorder and to causally connect it to her work accident of 1984, and based upon these facts alone it would appear the Industrial Commission's decision was against the manifest weight of the evidence.

However, the Commission also stated that the claimant's lack of credibility was a primary reason for denying the claimant benefits. As we noted previously, witness credibility is the province of the Commission and its determination will not be overturned unless it is against the manifest weight of the evidence. (*Dean v. Industrial Comm'n* (1986), 143 Ill. App. 3d 339, 493 N.E.2d 16.) The Industrial Commission found that the claimant lacked candor in her interactions with her treatment providers; however, the Commission did not cite specific instances where the claimant was not truthful to her service providers. In fact, neither Dr. Teichmann nor Dr. Ward believed the claimant to be malingering, nor did Dr. Szymke find the claimant dishonest.

The Commission held in its decision that the claimant's statements that her failure to take her blood-pressure medication was due to insufficient funds to purchase the medication were impeached by Dr. Kessler's notes which indicated that she had the medication but simply forgot to take it. Dr. Kessler's notes of March 1986 indicated

that he had given her a month of samples of the medication, which would explain the inconsistency of the claimant's testimony at the May 1986 hearing in this regard. Further, the evidence that the claimant had her blood-pressure medication in 1986 did not contradict her statement the she had insufficient funds with which to purchase this medication in 1987. Dr. Teichmann also testified that the claimant lacked sufficient funds to purchase her medication.

The Commission noted that Dr. Ward testified that the claimant's veracity was important and the fact that an MMPI had been previously recommended "could" be important. The doctor explained that the significance of a prior MMPI would be to show the claimant's psychological "vulnerability," and not that it would negate his current diagnosis. The doctor had testified that he had not sought other test results when treating the claimant as he did not normally do so. Although Dr. Ward was unaware of Dr. McLean's recommendation that the claimant be administered an MMPI in 1979, this fact does not reflect unfavorably upon the claimant's credibility. There was no evidence elicited that the doctor had questioned the claimant about Dr. McLean's recommendation and that she had given a deceptive answer to such a query. Dr. Ward's disregard of other psychological testing of the claimant indicated that his knowledge of the test results did not alter his diagnosis and treatment of the claimant's current psychological condition.

The Commission lastly determined that it did not find the claimant's complaints of loss of memory or confusion credible. The Commission held that the claimant "is cogent and has excellent recall of those matters which she believes serve her interest in this litigation and that she claims she cannot recall or is confused by questions relating to matters that she believes are detrimental to her claim. The Commission finds that Petitioner was not truthful in her denial of activity and social interaction and that she is deliberately seeking to manipulate opinions so as to obtain benefits provided in the Workers' Compensation Act." This statement by the Commission is very broad and nonspecific, with the exception of the Commission's statement as to the claimant's denial of her activities. Our review of the record did not disclose that the claimant denied her activities and social interaction; in fact, she revealed her activities readily to Dr. Teichmann. While the claimant did appear to balk at the respondent's questioning of her activities, we find that the respondent's questions to her in this regard were unclear and misleading. While taking into consideration that this claimant was not an ideal witness, it also must be considered that her condition caused her to be easily angered and volatile, and

that the questions asked by the respondent were of her activities of more than a year prior to this hearing. A single dinner party attended in March of 1986 may be hard to recall in May of 1987, especially since the claimant's condition is marked by confusion and loss of memory. Therefore, we determine that the Industrial Commission's determination that the claimant lacked credibility was against the manifest weight of the evidence.

We further find that the claimant sufficiently proved that her condition was permanent and totally disabling. It was Dr. Teichmann's testimony that the claimant was unable to work as her psychological condition prevented her from doing so, and that the claimant's disability was permanent. Therefore, we reverse the Industrial Commission's determination that the claimant was not entitled to benefits because she failed to prove a causal connection between her condition of ill-being and her work accident, and reinstate that portion of the arbitrator's decision which held that the claimant was permanently and totally disabled. Because of our favorable disposition of the claimant's argument that the Commission's decision of causal connection was against the manifest weight of the evidence, we deem it unnecessary to address her argument that the Commission's determination was also erroneous as a matter of law.

■ The second issue raised by the claimant is that the Industrial Commission erred when it failed to award her penalties pursuant to sections 19(k) and 19(*l*) and to award her attorney fees pursuant to section 16 of the Workers' Compensation Act. (Ill. Rev. Stat. 1987, ch. 48, pars. 138.19(k), 138.19(*l*), 138.16.) Our review of the record reveals that the claimant first sought section 19(*l*) penalties at her hearing before Arbitrator Preibus on May 15, 1986. The claimant did not indicate in her request for hearing before the arbitrator that she was seeking penalties or attorney fees; however, at the hearing before Arbitrator Preibus, her counsel stated as follows:

> "Counsel for the Respondent has been present at the taking of the depositions and he knows the testimony given by them which goes back to October and November of 1985. There was no showing that during the interim from the hearing on November 15, 1984[,] to the present time that Sara May had recovered from her injuries so that she could return to work and we're asking for the full statutory penalty of $2500.00 at the rate of $10.00 a day for the refusal to pay the temporary total disability which would have accrued during this same period."

At the end of that hearing, Arbitrator Preibus found that the claimant had been permanently and totally disabled since her prior arbitra-

tion hearing of November 15, 1984, and denied her oral motion for section 19(*l*) penalties. (We note that section 19(*l*) penalties apply to the failure to pay TTD and not for nonpayment of awards of permanent and total disability, and that since Arbitrator Preibus found the claimant to be permanently and totally disabled, section 19(*l*) penalties were not applicable.)

Subsequently, on April 9, 1987, the claimant filed a written motion with the Industrial Commission for the assessment of section 19(k) and section 19(*l*) penalties and for attorney fees under section 16. Likewise, on the review proceedings stipulation form, it was indicated that the issues of section 19(k) and section 19(*l*) penalties and of attorney fees pursuant to section 16 were to be considered at the hearing on review before the Commission. At the hearing before the Commission on June 18, 1987, the claimant's motion was not discussed nor was evidence on the claimant's motion presented. The Industrial Commission's decision did not mention the claimant's motion for penalties and attorney fees. While it is a fair assumption that the Industrial Commission did not discuss this motion in its decision as it modified the arbitrator's decision and denied the claimant benefits because she failed to prove causal connection between her disability and her work accident, thereby finding no award upon which the penalties would be given, we cannot rest on this assumption. However, because there is no indication in the record that the Commission even considered the claimant's motion, and because we have found that the claimant is entitled to benefits for her disability, we remand the issue of penalties and attorney fees back to the Commission for consideration, as the determination of whether the circumstances warranted the imposition of penalties and attorney fees is a question of fact for the Commission to decide. *Garrison v. Industrial Comm'n* (1980), 83 Ill. 2d .375, 415 N.E.2d 352; *A.O. Smith Corp. v. Industrial Comm'n* (1976), 65 Ill. 2d 224, 357 N.E.2d 539.

■■■ The last issue presented by the claimant on appeal is that the Industrial Commission erred when it found that the respondent was not liable for the medical bills attributed to the Institute and to the medical providers flowing from the chain of referral from the Institute. The Commission denied the claimant's request for payment of these medical expenses because Arbitrator Metts, in his decision of April 23, 1985, had disallowed these expenses as violative of the two-doctor rule of section 8(a)(3). The Commission determined that since this decision was not appealed by either party, Arbitrator Metts' decision became a final decision of the Commission and that the doctrine of *res judicata* prohibited the payment of these expenses by the re-

spondent. The claimant argues that the doctrine of *res judicata* is not applicable as the issue of the medical bills being violative of the two-doctor rule was not in dispute or litigated at the arbitration hearing. The claimant also argues alternatively that she can challenge the arbitrator's decision under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401), or that these expenses can be considered as mental rehabilitation services under section 8(a)(3) of the Workers' Compensation Act, and thus these expenses were not subject to the two-doctor rule.

With regard to the issue of whether the arbitrator's decision was subject to the doctrine of *res judicata,* we find that the Commission correctly determined that issue. The doctrine of *res judicata* was created to put an end to litigation, and to that end, issues decided upon their merits shall remain in repose upon the entry of a final judgment upon them. (*Hughey v. Industrial Comm'n* (1979), 76 Ill. 2d 577, 394 N.E.2d 1164.) The doctrine applies not only to matters actually decided but also to other matters which could have properly been raised and determined. (*Hughey v. Industrial Comm'n* (1979), 76 Ill. 2d 577, 394 N.E.2d 1164.) In the case *sub judice,* the issue of the medical expenses the claimant seeks to obtain reimbursement for was litigated at the arbitration hearing before Arbitrator Metts. The request for hearing form contained in the record of the first arbitration hearing indicated that the claimant was seeking payment of the medical expenses which had not been paid by the respondent and which were incurred at the Institute. The respondent, on that same form, contended that the medical expenses that the claimant sought were not reimbursible for three reasons: (1) that the expenses were not payable because the claimant's disability was not causally connected to her employment; (2) that the expenses were not payable as they were unreasonable and unnecessary; and (3) that the expenses incurred were in violation of the two-doctor rule. At the arbitration hearing, the claimant introduced the medical bills from the Institute into the record for the purpose of obtaining reimbursement. This evidence was sufficient to show that the medical expenses were in dispute at the arbitration hearing of November 15, 1984, and that the arbitrator properly entered a ruling on this issue.

Once the arbitrator's decision on the issue of medical expenses was entered, if the claimant believed this to be an erroneous ruling, it was incumbent upon her to appeal this issue to the Industrial Commission within the statutory time frames allowed. This she did not do. Therefore, pursuant to section 19(b), the arbitrator's decision on this issue became the final judgment of the Commission since it was not

appealed by either party. (*Garcia v. Industrial Comm'n* (1983), 95 Ill. 2d 467, 448 N.E.2d 879; *Wiscons v. Industrial Comm'n* (1988), 176 Ill. App. 3d 898, 531 N.E.2d 956.) Upon the arbitrator's decision to deny reimbursement of the Institute's medical expenses incurred by claimant becoming a final judgment of the Commission, the second arbitrator and the Commission had no jurisdiction to consider this matter. Therefore, that portion of the Commission's decision that the arbitrator's decision was *res judicata* with regard to this issue is affirmed.

Additionally, we note that the claimant's argument that the expenses incurred at the Institute subsequent to the initial hearing before the arbitrator were different expenses and therefore a different issue is without merit. The issue of the provider was decided and the subsequent bills were from this same provider, and the doctrine carried over to the bills incurred after November 15, 1984.

Lastly, we decline to consider whether these expenses may be considered under the claimant's alternative arguments, as the claimant fails to cite any authority for these propositions and submits only a bare statement as her argument. Failure to cite relevant authority and to adequately state an argument is violative of Supreme Court Rule 341(e)(7) and need not be considered by this court. (113 Ill. 2d R. 341(e)(7); *County of Cook v. Industrial Comm'n* (1988), 177 Ill. App. 3d 264, 532 N.E.2d 280.) Further, with regard to the claimant's argument that this issue may be considered under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401), we need not address this argument for the additional reason that this theory is raised for the first time on appeal and had not been presented to the circuit court. *Chambers v. Industrial Comm'n* (1985), 139 Ill. App. 3d 550, 487 N.E.2d 1142.

For the foregoing reasons, the judgment of the circuit court of Peoria County confirming the decision of the Industrial Commission is reversed with regard to that portion of its decision finding that the claimant failed to prove her disability was causally connected to her employment, and is remanded to the Commission for a determination of the amount of the benefits the claimant is to be awarded in accordance with this opinion. This cause is also remanded to the Industrial Commission for consideration of the claimant's motion for assessment of section 19(k) and section 19(l) penalties and of attorney fees pursuant to section 16, to determine whether the circumstances of this case warrant the imposition of these penalties. That portion of the decision of the Industrial Commission finding that the medical expenses of the Institute of Physical Medicine and Rehabilitation and the expenses

flowing from medical providers to which the claimant was referred by the Institute were not reimbursible under the doctrine of *res judicata* is affirmed.

Reversed in part and remanded; affirmed in part.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.