COUNTY OF COOK, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Michael Fajdich, Appellee).

First District (Industrial Commission Division)   No. 1—87—2906WC

Opinion filed November 2, 1988.—Rehearing denied January 5, 1989.

266

Richard M. Daley, State's Attorney, of Chicago (Helen Haynes, Assistant State's Attorney, of counsel), for appellant.

Joseph A. Vitell, of Chicago, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, Michael Fajdich, filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*) for injuries received in an accident on January 5, 1983. The accident occurred while claimant was a passenger in his employer's truck returning from his day's tasks to the employer's garage. At the hearing before the arbitrator on September 29, 1983, claimant contended that his accident occurred while in the course of his employment, which claim the respondent, Cook County Highway Department, disputed. After hearing testimony and considering the exhibits received into evidence, the arbitrator, in her order of October 10, 1983, determined that claimant's injuries were incurred in the course of his employment and awarded claimant temporary total disability payments for 10 6/7 weeks, benefits for permanent partial loss of 20% of the use of his right arm (47 weeks) and benefits for serious and permanent disfigurement of the face (10 weeks). The arbitrator further ordered the respondent to pay $1,732.80 for claimant's necessary medical expenses. The Industrial Commission affirmed the arbitrator's decision, and on review, the circuit court confirmed the Industrial Commission's order. The respondent appeals.

On appeal, respondent raises two primary issues: First, that claimant's injuries did not arise out of the course of his employment as claimant was intoxicated at the time of the accident, and second, that the arbitrator's award of temporary total disability and for permanent partial disability were against the manifest weight of the evidence. Before considering these issues, a statement of the facts is necessary.

At the hearing before the arbitrator, claimant testified that he was hired as a truck driver and a laborer by the respondent on October 12, 1982. On January 5, 1983, claimant worked the 7 a.m. to 3:30 p.m. shift. He reported to work slightly before 7 a.m. and was assigned the task of placing gravel on the soft shoulder along the road. On that date, he worked with Sandy Simmons, who was assigned as driver of the county truck.

Claimant worked at his required tasks until approximately noon that day, whereupon he and Simmons picked up a sandwich and a six-pack of Old Style beer for lunch. Because they were required to stay

with their vehicle, they ate their lunch in the cab of the truck. According to claimant's testimony, he drank two cans of beer with his lunch, Simmons drank two cans of beer at lunch, and two full cans of beer remained. Claimant resumed his tasks after lunch.

Sometime after 2 p.m. that afternoon, claimant and Simmons had finished their work for the day and were returning to the county's garage. As they came onto a ramp to get onto I-55, another vehicle cut in front of their truck, causing it to swerve off the ramp and into a ditch. The truck overturned, and claimant lost consciousness. He regained consciousness at the hospital.

Claimant was taken by ambulance to La Grange Community Memorial General Hospital, where he was treated for his injuries. As a result of the accident, claimant had lacerations above his right eye and on his right cheek, a small laceration under his tongue, an abrasion over his right clavicle, and a broken right clavicle. The hospital records revealed that claimant had an acetone odor (ethanol) on his breath. It was noted that claimant had slurred speech and moderate disorientation. The emergency room doctor applied a clavicle strap (shoulder harness) and cleaned and sutured the lacerations. X rays and blood tests were taken. The results of the blood test revealed that claimant had an ethanol blood level of 0.25. Claimant was released for work by his doctor on March 21, 1983. At the time of the hearing before the arbitrator, claimant was on suspension from his employment.

Claimant testified that on the evening prior to the accident, he watched television and drank 10 to 12 cans of beer, a long-standing daily habit of his for the past 20 years. Claimant stated that he had felt no ill-effects the next morning from his previous night's drinking. Claimant denied consuming any alcohol prior to lunch on the day of the accident.

Claimant's wife, Carmen Fajdich, testified that she had been married to the claimant for 22 years. She corroborated claimant's testimony that he habitually consumed 6 to 12 cans of beer each day for the past 20 years.

Vernon Volke, an assistant chief engineer for the Cook County Highway Department, testified that he went to the scene of claimant's accident on January 5, 1983, at approximately 4:30 p.m. He inspected the scene of the accident and took photographs of the area. Inside the cab of the truck he observed approximately a half dozen Old Style beer cans, two of which were unopened. According to Volke, two of the cans of beer were 16 ounce cans and the other cans were 12 ounces. Volke was unable to state with certainty whether the beer cans inside the cab were from claimant and Simmons or whether the

cans were debris picked up by them. However, he stated that the picking up of debris was not claimant's assigned task for that day.

According to Volke, the written rules and regulations of the Highway Department prohibited its employees from drinking alcoholic beverages during working hours. He testified that claimant was given four or five different sets of policies and procedures, and at the end of each policy and procedure was an affidavit that the employee was to sign. The affidavit stated that the employee has read the policies and procedures, that the employee understands the policies and that he will abide by those policies. He said that claimant had signed such an affidavit, but he did not produce that document at the hearing. He admitted that it was not the custom and habit of the county to send an employee out on a work assignment if the employee was drunk.

Volke's testimony established that at the onset of each working day, every vehicle was assigned a driver. Although a specific driver was designated for each vehicle, anyone assigned to the work detail was permitted to drive the truck. He corroborated claimant's testimony that Simmons was the assigned driver to the truck the day of claimant's accident.

Upon being questioned by the arbitrator, Volke did not recall the suspension of any employee for drinking a beer at lunchtime in the six months prior to the accident. He also admitted that the rules may be "bent," and that there was no regular monitoring of employees at the end of their shifts to determine if an employee had been drinking during work hours.

Dr. Gerald Atlas, the director of medical services for the Cook County commission, testified that he was familiar with the general effects of alcohol consumption in the human body. He stated that there are great physiological variances, but that a laboratory reading of 0.15 usually indicates that a person is unmistakably drunk and a laboratory reading of 0.30 indicates that a person is stuporous. According to his testimony, at a 0.25 alcohol level, a person has a marked disturbance of coordination to such a degree that it would be almost impossible for that person to do any refined acts. He explained that "refined acts" are acts requiring point-specific judgment, body reaction, eye-to-hand relationship, and coordinative reaction. However, at the 0.25 level, it was possible that a person could stand and could shovel gravel, as these are "cord functions," *i.e.*, a function that can be performed without thinking of how to do it, a conditioned reaction.

Dr. Atlas testified that there would not be any residual alcohol in the blood from beers consumed the night before at 12 midnight by 2 p.m. the next day, with the exception that someone who has cirrhosis

of the liver may retain alcohol in the blood. He further stated that studies have shown that some persons who have been drinkers all of their lives accumulate substantial levels of alcohol in their blood and exhibit few or little signs of inebriation. He also admitted that medication can create a high ethanol reading in a laboratory blood test.

After hearing the testimony and considering documentary evidence, the arbitrator concluded that claimant's injuries arose out of and in the course of his employment as respondent failed to show that claimant was unable to perform his assigned tasks. The arbitrator determined that it was not shown that claimant left the course of his employment when he violated the respondent's rules forbidding the drinking of alcoholic beverages during working hours as respondent did not prove that its rules were strictly enforced. The arbitrator's decision was affirmed by the Industrial Commission and confirmed by the circuit court.

Initially, respondent contends that claimant's injuries were not compensable as his injuries did not arise out of his employment. In support of this argument, respondent asserts claimant's intoxication as a defense to compensation.

■■ ■ In order for an injury to be compensable under the Workers' Compensation Act, it must both "arise out of" and be sustained while "in the course of" employment. (Ill. Rev. Stat. 1983, ch. 48, par. 138.2; *Eagle Discount Supermarket v. Industrial Comm'n* (1980), 82 Ill. 2d 331, 412 N.E.2d 492.) "Arising out of the employment" means that the injury must have had its origins in some risk incidental to the employment, while "in the course of employment" refers to the time, place and circumstances of the injury. (*Eagle Discount Supermarket,* 82 Ill. 2d 331, 338, 412 N.E.2d 492, 496.) Intoxication, in itself, is insufficient to defeat recovery under the Workers' Compensation Act. (*M & M Parking Co. v. Industrial Comm'n* (1973), 55 Ill. 2d 252, 302 N.E.2d 265.) For a claimant's injury to be noncompensable because of intoxication, it must be shown that the employee was so intoxicated that the court can say that his injury arose out of his drunken condition and not out of his employment. (*District 141, International Association of Machinists & Aerospace Workers v. Industrial Comm'n* (1980), 79 Ill. 2d 544, 404 N.E.2d 787; *Freeman United Coal Mining Co. v. Industrial Comm'n* (1987), 160 Ill. App. 3d 524, 513 N.E.2d 555.) Further, even if an employee's intoxicated condition is a contributing cause of his injury, if the employee is not incapacitated from following his occupation, his recovery of compensation will not be defeated. *District 141, International Association of Machinists,* 79 Ill. 2d 544, 404 N.E.2d 787.

Respondent's defense of intoxication was based primarily on claimant's blood-alcohol level of 0.25. Respondent claimed that since there is a legal presumption of intoxication when a person has a 0.10 blood-alcohol level under the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95½, par. 11—501.2(b)(3)) and since claimant's blood-alcohol level was in excess of the statutory level, that claimant's intoxication should defeat recovery. Respondent also argued that the doctor's testimony established that a person having a blood-alcohol level of 0.25 would have marked disturbance of coordination, blurred vision, and a great disturbance of depth perception and, therefore, with these physical impairments, it was impossible for claimant to perform his required tasks.

■ Initially, we note that respondent's argument that claimant was legally intoxicated under the Illinois Vehicle Code is not relevant. The standard to be applied for an intoxication defense, as was noted previously, is whether a claimant is so intoxicated that he cannot perform his occupational tasks. Respondent urges this court to change this standard and to apply the standard of the Illinois Vehicle Code for showing a person to be legally intoxicated. Respondent claims that the current standard for the intoxication defense places an impossible burden on the respondent to prove an employee intoxicated without objective criteria such as blood-alcohol levels but respondent cites no authority nor gives examples of why the current standard is so onerous. Therefore, we find no reason to change the current standard of proof of an intoxication defense.

■ Further, the evidence did not show that claimant was unable to perform his required tasks. Claimant testified that after he drank his two cans of beer at lunchtime, he returned to his task of placing stone on the shoulder of the roadway. Respondent presented no evidence to contradict claimant's testimony. The doctor's testimony established that a person could perform the tasks required of claimant even when intoxicated as this type of activity is a "cord function," *i.e.*, a conditioned reaction. While respondent argues that the doctor's testimony asserted that a person having a blood-alcohol level of 0.25 would have a marked disturbance of coordination, blurred vision, and a great disturbance of depth perception, no evidence was presented that claimant displayed any of these physical characteristics. Dr. Atlas did not examine the claimant at the time of the accident and none of the questions addressed to him were specific as to claimant's condition on that date, but were only of a hypothetical nature. Thus the doctor's testimony did not conflict with claimant's testimony that he could perform his duties. Accordingly, although claimant may have

been intoxicated at the time of the accident, his intoxication did not defeat his claim for compensation.

Respondent also claims that even though claimant was not driving at the time of the accident, he was entitled to drive the county truck but his condition rendered him incapable of this and therefore claimant was incapable of performing his required duties. This argument is speculative at best. Although respondent argues that claimant was legally drunk and unable to drive the truck, the evidence clearly showed that it was not the claimant who was driving the vehicle at the time of the accident.

In conjunction with respondent's intoxication defense, respondent also contends that claimant violated its rules and regulations when he consumed alcohol during working hours; therefore, his accident did not arise out of his employment. Because claimant violated this rule, claimant was not following his employer's instructions and claimant's accident was outside the scope of his employment.

■ Whether claimant's violation of his employer's rules and regulations made his injury noncompensable was a question of fact for the Industrial Commission and its decision will not be set aside unless its determination is against the manifest weight of the evidence. (*Northwestern Steel & Wire Co. v. Industrial Comm'n* (1967), 38 Ill. 2d 441, 232 N.E.2d 293.) Further, an employee may be entitled to compensation even though he may have violated a rule of his employer, especially where that rule was unenforced. *Northwestern Steel & Wire Co. v. Industrial Comm'n*, 38 Ill. 2d 441, 232 N.E.2d 293.

■ The Industrial Commission found that respondent failed to prove that the rules prohibiting drinking alcoholic beverages during working hours were strictly enforced by the respondent. This finding was not against the manifest weight of the evidence. Volke's testimony established that there had been no suspensions of employees in the six months prior to claimant's accident for an employee drinking during working hours. Volke's testimony also established that the rules of the county had been "bent" upon occasion. Volke also testified that respondent had no method for regularly checking its employees at the end of a day to determine if an employee had been drinking during working hours. Thus it was a reasonable inference from this evidence that the respondent did not strictly enforce its rule.

It is also important to note that it was not proven that claimant's injury was causally connected to the claimant's violation of respondent's rules. The violation of respondent's no-drinking rule occurred during lunchtime. Claimant's accident occurred sometime after 2 p.m. and after he had returned to his course of employment. *Checker Taxi*

*Cab Co. v. Industrial Comm'n* (1970), 45 Ill. 2d 4, 256 N.E.2d 828.

■ Respondent's last contention that claimant's injury did not arise out of the course of his employment is that the respondent's line of questioning regarding the condition of the driver of the vehicle at the time of the accident was erroneously disallowed by the arbitrator as irrelevant. Respondent argues that this line of questioning "might" have established that claimant and the driver were on a "frolic" and thus claimant's injury did not arise out of his employment. Again, this argument is speculative and not supported by any case authority. Supreme Court Rule 341(e)(7) (113 Ill. 2d R. 341(e)(7)) provides that an appellant's brief must cite to relevant authority to support an argument advanced upon appeal. Respondent's failure to cite authority in support of its argument fails to comply with Supreme Court Rule 341(e)(7) and will not merit consideration upon appeal. *Britt v. Federal Land Bank Association* (1987), 153 Ill. App. 3d 605, 505 N.E.2d 387.

■ Nevertheless, regardless of whether claimant and the driver had been on a "frolic" at an earlier time, as was noted earlier, the evidence supported the determination that claimant had returned to the course of his employment and that his injury had occurred after he had done so. If, *arguendo*, there was any deviation earlier from his employment, this deviation would not defeat his claim. (*Checker Taxi Cab Co.*, 45 Ill. 2d 4, 256 N.E.2d 828.) The arbitrator was also correct in that the condition of the driver was not relevant to whether claimant was injured in the course of his employment.

Respondent's last contention is that the Industrial Commission's award for permanent partial loss of 20% use of claimant's right arm and for $10^6/7$ weeks of temporary total disability payments was against the manifest weight of the evidence. Respondent claims that the medical evidence presented failed to establish any functional loss of claimant's right arm; therefore, the arbitrator's allowing a 20% loss cannot stand.

■ It is the primary responsibility of the Industrial Commission to determine the nature and the extent of a claimant's injury, and the Industrial Commission's findings will not be set aside upon review unless those findings are contrary to the manifest weight of the evidence. (*Wallace v. Industrial Comm'n* (1983), 98 Ill. 2d 33, 455 N.E.2d 92.) It is the claimant who has the burden of proving his claim by a preponderance of credible evidence. (*Wallace*, 98 Ill. 2d 33, 455 N.E.2d 92.) When the Industrial Commission has made a determination, it is presumed that it considered proper and competent evidence. (*English v. Industrial Comm'n* (1986), 151 Ill. App. 3d 682, 502

N.E.2d 1247.) Resolving disputes in the evidence and drawing reasonable inferences and conclusions from that evidence is the responsibility of the Industrial Commission, and given its expertise in the area of workers' compensation, its findings on the disability of a claimant should be given substantial deference. *English v. Industrial Comm'n,* 151 Ill. App. 3d 682, 502 N.E.2d 1247.

■ The Industrial Commission's decision finding claimant was entitled to an award for the permanent partial loss of 20% of the use of his right arm and for temporary total disability payments for 10⁶/₇ weeks was not against the manifest weight of the evidence. The arbitrator found that the claimant's subjective complaints were supported by Dr. Hirshfield's medical report and by the medical records from La Grange Community Memorial General Hospital.

Claimant testified that he had a chipped bone in his right elbow. Claimant stated that when he arises in the morning and gets dressed, his right elbow causes him pain. When he raises his right arm to comb his hair or to shave, his right shoulder hurts. He stated that he applied a heating pad every night.

Dr. Hirshfield's letter of June 8, 1983, stated that he examined the claimant on June 2, 1983. The doctor's letter noted that claimant had been in a truck accident and that he had "cut his eye above and below, cut his nose and forehead, chipped a bone in his right elbow and injured his left elbow and fractured his right collarbone." He stated that claimant's treatment for these injuries included the taking of X rays, suturing of the lacerations, and receiving a tetanus shot and a shoulder harness for his right arm. He noted that claimant's personal physician gave him some pain pills, aspirated fluid from his right elbow and injected medication into the right elbow.

Dr. Hirshfield's examination revealed that claimant's right arm measured one-quarter inch more than his left arm, that claimant's right and left elbows measured the same and that the "motility" of both arms and both elbows was intact. The X rays of the right collarbone showed that there had been a fracture mid-clavicle which had a "calus formation." The X rays of the right elbow revealed that "[t]here is an area of increased bony density [in the] proximal portion of the ulna which may be consistent with trauma."

Respondent introduced a letter from Dr. Sid John Shafer into evidence at the hearing before the arbitrator. This letter explained that he had examined claimant on July 22, 1983. He found that claimant had a normal range of painless motion of both shoulders. He noted a thickening of the right clavicle "at the junction of the middle and outer third." He determined the motions of claimant's right and left

elbows to be identical and that there was no evidence of tenderness, swelling or deformity of the elbows. He stated that "there is a normal range of painless motion of both wrists and fingers and there is no evidence of tenderness, swelling or deformity of the above mentioned joints." He took X rays of claimant's shoulders and clavicles. The X rays revealed a healed fracture of the right clavicle and failed to reveal any evidence of abnormality of the shoulders.

The medical evidence corroborated claimant's subjective complaints regarding his right elbow. Claimant testified that his right arm hurt and that his right elbow had a chipped bone in it. The X rays of his right elbow revealed that there was a density in that area. Dr. Hirshfield's report stated that claimant's right elbow had been chipped. Respondent's medical report of Dr. Shafer corresponded with Dr. Hirshfield's report; however, Dr. Shafer did not X-ray claimant's elbows but only his shoulders and clavicle areas. Claimant proved his claim by a preponderance of credible evidence.

■■■ Respondent argues that claimant should only have been given temporary total disability from the date of the accident to February 17, 1983, as on that date Dr. Demange's records (claimant's treating physician) revealed that claimant's clavicle was healed and nontender. Dr. Demange's records also stated on that date that claimant was able to return to work on March 21, 1983. To prove temporary total disability, a claimant must show that he did not work and that he was unable to work. (*Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364.) Here the claimant proved that he was unable to work when he introduced Dr. Demange's medical records. The evidence provided a reasonable basis for the Industrial Commission to infer that he was unable to work until March 21, 1983, and its award of temporary total disability payments was not against the manifest weight of the evidence.

For the foregoing reasons, the order of the circuit court of Cook County, confirming the decision of the Industrial Commission, is affirmed.

Judgment affirmed.

BARRY, P.J., and McNAMARA, WOODWARD, and McCULLOUGH, JJ., concur.