PETER W. SEKORA, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Du Page Honda *et al.*, Appellees).

Second District (Industrial Commission Division)   No. 2—89—0759WC

Opinion filed June 12, 1990.

Richard E. Aleksy, of Zaborsky & Aleksy, of Chicago, for appellant.

Industrial Commission of Illinois and Paul L. Leeds, both of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Peter W. Sekora, sought worker's compensation benefits after injuring his leg while working for respondent, Du Page Honda. An arbitrator awarded benefits. The Industrial Commission reversed, finding petitioner failed to prove he sustained accidental injuries arising out of and in the course of his employment. The trial court confirmed the Commission's decision. On appeal, petitioner contends the Commission's decision is wrong as a matter of law and is against the manifest weight of the evidence.

Petitioner testified that on August 8, 1983, he worked part time for respondent as a salesman. At about 8:30 p.m., petitioner and other employees were performing the daily task of taking all vehicles displayed outside the building into the garage at the end of the night. Forty or fifty vehicles had been brought in when petitioner and David Yanke, another employee who petitioner stated was working that evening, drove two of the all terrain cycles (ATC) into the one-acre field next to the dealership building. These vehicles are three-wheeled motorcycles. Petitioner had also ridden "some" of the other vehicles in the field that night. After riding in the field for a short time, petitioner was returning to the building when he crashed and broke his leg in three places. Petitioner described the accident:

> "We started pulling motorcycles and vehicles and lawn mowers—everything that was outside—in, and we proceeded to pull things in. We went out and took a ride down in the field; and on the way back, I don't know exactly what it was, but something caused the vehicle to flip."

Petitioner testified that it was not unusual to ride the vehicles in the field, either to attract customers, or to learn how to drive the new models so the salespeople could adequately demonstrate them to customers. Respondent provided the salespeople with no training program.

> "New items that they wanted to test drive if we had free moments, we would at that point in time—when bringing vehicles in, we would familiarize ourselves with new types of vehicles, how to operate them. So, we could show them to the customers—how they would work, how they function."

Petitioner was not sure, but it was possible that the ATC he rode on the night of the accident was not a new model and that he had driven it into the building many times before. He was riding about 10 or 12

feet into the field.

Petitioner testified further that another employee had been in an accident on an ATC the weekend before. Petitioner denied any knowledge of instructions given after that accident to no longer ride the vehicles, but instead to walk them into the garage at the end of the night.

Petitioner testified that on August 22, 1983, he spoke on the telephone with an insurance company representative and gave his permission to tape the conversation. The tape revealed that petitioner admitted that he was not riding to attract customers on the night of the accident.

David Rietz, a salesman for respondent, testified that he was in charge on the night of the accident. Yanke was not working that night, but had come in about 45 minutes before the accident. Rietz did not give petitioner permission to ride the vehicle. Rietz had pushed several vehicles in that night, but did not see the accident. The accident occurred about 1,200 feet back into the field.

Rietz testified that about six months before the accident, William VanderBrook, respondent's president, had told the salespeople they could ride in the field if they wore helmets. However, four or five weeks before the accident the rule was changed because of several "mishaps." Salespeople had been riding without helmets, there had been several accidents, and one employee had broken his wrist. Consequently, VanderBrook instructed the employees that they had to push the vehicles in. The only time they were to be driven in the field was to demonstrate for a customer. The only time the employees were to try out new products was when VanderBrook or the person in charge gave permission to do so.

Thomas Welter, respondent's service manager, testified that he telephoned petitioner at the hospital on August 9, 1983. "He stated that he shouldn't have been doing what he was doing." Welter examined petitioner's and Yanke's motorcycles after the accident. Petitioner's ATC sustained minor damage. Yanke's ATC had a bent rear axle.

William VanderBrook testified that he "was very strict with the fact they brought them directly into the building and did not horse play on them." Prior to May 8, 1983, employees could start the engines, but could not ride the vehicles unless they were demonstrating for a customer. Once or twice he gave permission for salespeople to ride in the field to attract customers. After May 8, 1983, when an employee broke his wrist while "horsing around" on an ATC, VanderBrook instructed all sales personnel that they could not even start the engines. While he did not recall "looking [petitioner] in the eye"

personally and reciting the instruction, VanderBrook "remember[ed] telling all the salespeople." He believed that petitioner was told along with all the salespeople. They had to roll the vehicles inside each night and take them directly to the shop.

VanderBrook testified that there was no training program. The salespeople could review the owner's manuals "and operating the vehicle is moving them inside and out of the building." After May 8, 1983, however, salespeople were not supposed to ride the vehicles to learn how to operate them. No one rode at all without his permission. VanderBrook acknowledged that in his absence it was possible "[t]hey could do it on their own without permission. I haven't got 100 percent control over these people." However, he was not aware of any incidents where employees rode in the field without his permission between May 8, 1983, and petitioner's August 3, 1983, accident.

In rebuttal, petitioner testified that he was never instructed not to ride the vehicles. While he was told once to ride in the field to attract customers' attention, he did not recall whether that was before or after May 8, 1983.

The arbitrator awarded compensation, but the Commission reversed, finding that petitioner and Yanke "were engaged in horseplay and that petitioner deviated from the scope of his employment." The Commission found petitioner's statement that he was putting the vehicle away lacked credibility, in that the emergency room history stated he was trying to draw a crowd when the two cycles became tangled, throwing petitioner off the cycle. The Commission found *Union Starch, Division of Miles Laboratories, Inc. v. Industrial Comm'n* (1974), 56 Ill. 2d 272, 307 N.E.2d 118, and *Scheffler Greenhouses, Inc. v. Industrial Comm'n* (1977), 66 Ill. 2d 361, 362 N.E.2d 325, not applicable because riding the ATC was not an act of "personal comfort." Moreover, in the present case, respondent had not acquiesced in the conduct.

The trial court confirmed the Commission's decision, finding it was not against the manifest weight of the evidence. The court found the matter presented a factual question and could not be decided as a matter of law. Petitioner maintains that a question of law is involved.

■■ If undisputed facts permit more than one reasonable inference to be drawn therefrom, a question of fact exists, and the conclusion of the Commission will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*Chicago Extruded Metals v. Industrial Comm'n* (1979), 77 Ill. 2d 81, 395 N.E.2d 569.) More than one reasonable inference can be drawn from the facts presented here, especially in regard to whether petitioner was involved in

conduct incidental to his work duties.

■ A compensable injury must "arise out of" and occur "in the course of" employment. An injury arises out of employment when a causal connection exists between the employment and the injury such that the injury has its origins in some risk incidental to the employment. (*Curtis v. Industrial Comm'n* (1987), 158 Ill. App. 3d 344, 511 N.E.2d 866.) An injury occurs during the course of employment when the employee is injured within the time period of employment, at a place where the employee can reasonably be expected to be in the performance of his duties and while he is performing those duties or doing something incidental thereto. *Eagle Discount Supermarket v. Industrial Comm'n* (1980), 82 Ill. 2d 331, 412 N.E.2d 492.

■ The injury here occurred during petitioner's work hours, but in the field, which was not a place where petitioner reasonably would be in the performance of his work as a salesman. Previously, employees had driven the vehicles in the field to capture the attention of potential customers passing by the property. The evidence shows petitioner was not attempting to attract customers just prior to closing.

Petitioner also argues he was riding the ATC to learn how to operate it and that "it was during this learning activity" that the accident occurred. The Commission could find, based on petitioner's own testimony, that he was not test-driving a new piece of equipment in order to better his knowledge of a new model and thus better serve the customer's needs and consequently benefit respondent. Petitioner did not even know whether the ATC he was driving was or was not a new model. Petitioner testified it was possible that it was not a new model, but may have been a vehicle he had ridden many times. Thus, the Commission was entitled to discount petitioner's explanation that he was learning how to operate "new types of vehicles" when the accident occurred.

The Commission could also question petitioner's purpose in riding the motorcycles on the basis that Yanke was not working that night. While petitioner testified that Yanke was on duty, Rietz testified Yanke was not working. Thus, the Commission could find that the two men were engaged in horseplay, not working or trying to gain knowledge of the vehicles' operation. In addition, petitioner testified he did not know what happened to cause the vehicle to flip. The condition of the two motorcycles, however, indicated that both the vehicles were involved in the accident, possibly becoming entangled. This, too, can indicate the two men were engaged in horseplay.

The third possible reason for riding the ATC would be just to bring it into the garage at the end of the day. However, petitioner's

testimony makes it clear he detoured by taking "a run up into the field" before bringing the vehicle inside. Moreover, while petitioner testified he was 10 or 12 feet into the field and only 20 feet from the garage, Rietz testified petitioner was 1,200 feet into the field when the ambulance arrived. Again, this could indicate petitioner was not in the process of bringing the ATC into the building when he crashed.

■ Petitioner contends, however, that respondent acquiesced in the custom of employees riding the vehicles in the field. Self-benefitting activities by the employee to which the employer acquiesces, or for which the employer allows the use of its property, have been held to be within the course of employment. (*Bradway v. Industrial Comm'n* (1984), 124 Ill. App. 3d 983, 464 N.E.2d 1139.) Thus, if an employee voluntarily and in an unexpected manner exposes himself to a risk outside any reasonable exercise of his duties, a resulting injury will not be within the course of employment unless the employer had knowledge of or acquiesced in such unreasonable conduct. (*Yost v. Industrial Comm'n* (1979), 76 Ill. 2d 548, 394 N.E.2d 1189; *Curtis v. Industrial Comm'n* (1987), 158 Ill. App. 3d 344, 511 N.E.2d 866.) VanderBrook and Rietz testified that no employee was allowed to ride in the field without permission. The Commission was entitled to find that testimony credible.

We conclude that the Commission could reasonably infer from the facts before it that petitioner acted without authorization by riding motorcycles in the field with Yanke in such a way as to result in the accidental injuries, and exposed himself to the risk of such injuries for which the Act will not provide compensation.

■ Significantly, even if permission to ride the vehicles had not been retracted in its entirety, prior to May 8, 1983, permission was limited to the one or two times the employees were asked to attract customers' attention and the times employees were demonstrating a vehicle for a customer. Neither of those situations was present here.

Thus, any permission previously given did not encompass the activities which resulted in petitioner's injuries. Moreover, the Commission could find VanderBrook's testimony, that all salespeople had been instructed to not even turn on engines and to roll the vehicles inside, was communicated to petitioner along with the rest of the staff.

Petitioner's reliance on *Scheffler Greenhouses, Inc. v. Industrial Comm'n* (affirmed award of compensation where employer authorized and invited greenhouse workers to use pool as relief from hot, humid work environment) and *Union Starch v. Industrial Comm'n* (affirmed award of compensation where employer acquiesced in employees' 15-year custom of using rooftop for work breaks for fresh air) is mis-

placed. This case does not involve petitioner's personal comfort. See, *e.g., Curtis v. Industrial Comm'n* (1987), 158 Ill. App. 3d 344, 511 N.E.2d 866.

Petitioner's reliance on *Chicago, Wilmington & Franklin Coal Co. v. Industrial Comm'n* (1922), 303 Ill. 540, 135 N.E. 784, is also unpersuasive. In that case, "trappers" gained experience and training as drivers by occasionally driving, even though the trappers should not have been permitted to drive. The employer in that case knew the rule prohibiting trappers from driving was not observed, and in fact at times it paid the trappers extra for their driving. No such acquiescence has been shown by petitioner in the present case.

We hold the inferences which the Commission drew from the evidence were reasonable and not against the manifest weight of the evidence. We will not disturb its decision denying benefits to petitioner.

For the foregoing reasons, the judgment of the circuit court of Du Page County, confirming the decision of the Industrial Commission, is affirmed.

Judgment affirmed.

BARRY, P.J., and WOODWARD, McCULLOUGH, and LEWIS, JJ., concur.