KROPP FORGE COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Francene Zozaski, as Parent and Custodian of Christopher Zozaski *et al.*, Minor Children of Dennis Zozaski, Deceased, Appellees).

First District (Industrial Commission Division)   No. 1—91—0175WC

Opinion filed January 31, 1992.

Jobin & Flynn, of Chicago, for appellant.

Lannon, Lannon & Barr, Ltd., of Chicago (Richard J. Barr, Jr., of counsel), for appellee.

JUSTICE STOUDER delivered the opinion of the court:

Following the death of Dennis Zozaski, the petitioners, Francene, Christopher, and Gregory Zozaski, brought a claim for workers' compensation against the respondent, Kropp Forge Company. The arbitrator found that Dennis' death arose out of his employment and awarded Christopher and Gregory, who were Dennis' minor sons, $283.33 per week, until the youngest reached the age of 18. The Industrial Commission (Commission) affirmed the arbitrator's decision, and the circuit court confirmed the Commission's decision. The respondent appeals.

At the hearing before the arbitrator, it was established that the respondent is a forging manufacturer which uses several furnaces to treat various metals. Dennis Zozaski, the decedent, was employed by the respondent as an instrument technician. His job was to maintain, inspect, and repair various instruments located on the outside and inside of the respondent's furnaces.

Dale Sevhla of the Cicero police department was called to the respondent's company at 5 a.m. on October 4, 1985. Sevhla observed a body in flames inside furnace 201. After waiting eight hours for the furnace to cool, he entered and removed the decedent's body. The decedent was still wearing his glasses. Evidence technicians also removed four beer cans, pliers, a gauge, a wrench set, goggles, and a hard hat. No flashlight was found in the furnace.

Furnace 201 was approximately 10 feet high, 10 feet wide, and 35 to 40 feet long. Materials were wheeled in and out of the furnace on a flatbed car which had steel wheels and ran on steel tracks. When the car entered the furnace, it became the furnace's floor, covering the entire length and width of the furnace. A door would then come down to close the furnace. The decedent was found pinned between the back wall of the furnace and the car.

The decedent arrived at work at approximately 6:15 a.m. on October 3, 1985. His supervisor was not present. Co-employee Mark Bolen testified that he gave the decedent a ride to work that morning and did not notice alcohol on his breath. The last time Bolen spoke with the decedent was 7:30 a.m. that day on the telephone. The decedent told Bolen he was feeling tired and was going to find a place to lie

down. Bolen admitted that he had given a prior statement in which he stated that the decedent had said he wanted to find a hole to crawl into. Bolen left work at 2:30 p.m. without the decedent. He noted that he had never seen the decedent sleeping in a furnace or anywhere else on the job.

Michael McDaniels, the decedent's immediate supervisor, testified that the employees in his charge, including the decedent, often performed unscheduled work inside the furnaces. McDaniels stated that his instrument repairmen would not know when a furnace was going to be run. When working inside a furnace, an employee was supposed to chain the door up so it could not close. In addition, tags were to be placed on the furnace warning that a worker was inside. Safety rules and bulletins were posted in the shop, and warning stickers were made available to employees. However, McDaniels stated that hardly anyone ever followed these safety procedures. The workers also did not notify anyone when they were working inside a furnace. When McDaniels saw workers not following safety procedures, he would reprimand them, but there were no written disciplinary actions and he did not punish them in any way.

According to McDaniels, a flashlight would not normally be needed for an inspection of a furnace, although it would be handy to have one. He noted that there was enough natural light by furnace 201 for someone to be able to inspect inside. However, to do repairs, a flashlight would be needed.

McDaniels further testified that the decedent had worked for him for approximately three years. During that time, he had observed the decedent inside furnaces approximately once every two weeks. The decedent had a hearing problem, and McDaniels sometimes had to yell to be heard by him. The decedent had often told McDaniels that he wanted to find a hole to crawl into, but McDaniels had never seen the decedent sleeping on the job. Occasionally, the decedent had come to work and told McDaniels that he had been drinking. On those occasions the decedent did not smell of alcohol, nor did he stumble or stagger. McDaniels would watch him closely and noted that he was able to perform his duties. According to McDaniels, the decedent was not a beer drinker and there were often empty beer cans scattered all around the furnace area. McDaniels stated that the decedent never drank at work, nor did McDaniels ever see him bring alcohol to work.

Pat Rangel, the chief metallurgist and heat treatment superintendent for the respondent, testified that no work could be done on a furnace without her knowledge. According to Rangel, such work would have to be ordered by a letter from her department to the in-

strument department. Standard procedure required a minimum of two men for any repair work. If inside work was required, the furnace doors would be blocked or chained. Rangel stated that she had never seen an instrument repairman inside a furnace.

Rangel further testified that no repairs were scheduled for furnace 201 on October 3, 1985. She stated there were no problems with furnace 201 that day or in the days immediately prior. According to Rangel, the flatbed car had been pulled out of furnace 201 and it was turned off on the morning of October 2, 1985. The furnace then remained open until 10:30 a.m. on October 3, 1985, when the car was moved into the furnace to obtain floor space. The car was removed at 4 p.m., loaded, placed in the furnace at 7 p.m., and the furnace was activated.

Rangel further stated that she had had a conversation with the decedent in her office on October 2, 1985. They were face to face, about four feet apart. She spoke in a normal tone and the decedent appeared to understand her.

Both McDaniels and Rangel testified regarding the ventilation in furnace 201. Rangel stated that ventilation would come from the open door of the furnace and cross-ventilation from the floor. McDaniels stated that this ventilation occurred when the flatbed car was out and the furnace door was open. According to McDaniels, there were occasional gas leaks inside the furnaces, which the instrument repairmen were required to fix. Rangel stated that approximately one month prior to the decedent's death, another furnace, 202, had exploded. The suspected cause was gas accumulation. Following the decedent's death, OSHA conducted an investigation and ordered the removal of certain obsolete piping to improve the ventilation of furnace 201. McDaniels stated that this only slightly changed the ventilation.

McDaniels and Rangel both testified regarding the sound and speed of a flatbed car as it moved into a furnace. McDaniels described the motor as quiet, but the wheels made a squeaky noise. He described the speed as walking speed or one foot per second. Rangel stated the wheels squealed and it was quite noisy. She described the speed as a very slow walk.

Frank Cooney, another of respondent's employees, testified that he saw the decedent at approximately 6:15 a.m. on October 3, 1985. There was nothing unusual about the decedent, and he did not smell of alcohol. Cooney stated that the decedent was hard of hearing and it was necessary to get his attention first and then talk "real loud" to him. Additionally, Cooney had never seen the decedent sleeping during work.

Francene Zozaski, the decedent's former wife, testified that he had a hearing problem that made it necessary to be within a few feet of him to communicate. She also stated that the decedent read lips. According to Zozaski, the decedent wore glasses but would take them off before napping.

The decedent's preemployment physical report was introduced. It indicated a problem with the decedent's hearing and recommended that a further examination be done to determine whether he needed a hearing aid.

It was stipulated that the decedent had received treatment at a hospital detoxification center approximately 10 months prior to his death. The respondent attempted to introduce these hospital records, contending they showed the decedent's lifelong problem with drinking. The arbitrator ruled the records inadmissible, stating that what happened to the decedent 10 months earlier was not relevant to whether he was intoxicated the day he died.

Dr. Schaffer, chief toxicologist of the Cook County medical examiner's office, described two tests done on blood and brain tissue samples taken from the decedent. According to Schaffer, the decedent was intoxicated. However, he also stated that a person's intoxication depends on the individual's level of alcohol tolerance, and a person's tolerance affects whether he can perform certain activities. Schaffer admitted that he did not know the decedent's tolerance for alcohol.

The arbitrator found that the decedent had sustained an accident which arose out of and in the course of his employment and which caused his death. He therefore awarded death benefits as previously described. The Commission affirmed the arbitrator's decision, and the circuit court confirmed the Commission's decision.

On appeal, the respondent first argues that the Commission's decision that the decedent's injuries and death arose out of his employment was against the manifest weight of the evidence. The respondent contends that death benefits should have been denied in the instant case because the decedent manifested a clear intention to remove himself from his employment when he advised his co-worker, Bolen, that he was going to find a place to lie down. The respondent also asserts that no evidence was presented that the decedent was performing his duties at the time of his death.

■ An injury is compensable under the Act only if it arises out of and in the course of employment. (*Panagos v. Industrial Comm'n* (1988), 171 Ill. App. 3d 12, 524 N.E.2d 1018.) For an injury to arise out of one's employment, it must have an origin in some risk connected with or incidental to the employment so that there is a causal

connection between the employment and the injury. (*Fire King Oil Co. v. Industrial Comm'n* (1976), 62 Ill. 2d 293, 342 N.E.2d 1.) An injury is in the course of employment when it occurs within the period of employment at a place where the employee can reasonably be expected to be in the performance of his duties and while he is performing those duties or something incidental thereto. (*Panagos*, 171 Ill. App. 3d at 15, 524 N.E.2d at 1020.) If an employee is injured as the result of his violation of the employer's safety rules, but is attempting to do the work he is employed to do, but merely violating the rule as to the manner of doing it, his injury is compensable. *Chadwick v. Industrial Comm'n* (1989), 179 Ill. App. 3d 715, 534 N.E.2d 1000.

It is the function of the Industrial Commission to decide questions of fact and causation and to judge the credibility of the witnesses. (*O'Dette v. Industrial Comm'n* (1980), 79 Ill. 2d 249, 403 N.E.2d 221.) The decision of the Industrial Commission should not be disturbed unless it is contrary to the manifest weight of the evidence. (*Orsini v. Industrial Comm'n* (1987), 117 Ill. 2d 38, 509 N.E.2d 1005.) A reviewing court should not overturn the Industrial Commission's findings simply because different inferences could be drawn, or otherwise substitute its judgment for that of the Commission. *Hoegger v. Industrial Comm'n* (1987), 158 Ill. App. 3d 1025, 512 N.E.2d 110.

In the instant case, the evidence was conflicting as to whether the decedent was in fact working for the respondent at the time he sustained the injuries which resulted in his death. While Bolen testified that the decedent told him he was going to find a place to sleep, he admitted that in an earlier statement he had said the decedent merely told him he wanted to find a hole to crawl into. McDaniels, the decedent's supervisor, stated that he had often heard the decedent say this, but had never found him sleeping on the job. Cooney, another co-worker of the decedent, also testified that he never saw the decedent sleeping at work. Furthermore, the decedent was wearing his glasses when his body was found and this appears to be inconsistent behavior for one whose alleged purpose was to take a nap.

Additionally, although Rangel testified that no work could be done on the furnaces without her knowledge, her testimony was contradicted by McDaniels, who stated that his instrument repairmen often performed unscheduled work inside the furnaces. The respondent also asserts that the decedent could not have been working in the furnace since no flashlight was found with his body. However, McDaniels' testimony indicated that certain inspections could be done on the inside of the furnaces without a flashlight. Furthermore, other work tools were found near the decedent's body.

We note that several witnesses testified to the decedent's hearing problem. Only Rangel stated that she had no problem communicating with the decedent. The evidence of the decedent's preemployment examination suggests that the respondent was aware of the decedent's hearing problem. Finally, while it appears that the decedent did not follow the proper safety procedures, McDaniels testified that hardly anyone ever followed them, and there was no apparent policy for enforcing them.

■ Clearly, there was enough evidence presented in the instant case from which the Industrial Commission could reasonably infer that the decedent had been performing his work in an area where he was expected to be at the time he died. Additionally, the fact that he may have violated safety rules is irrelevant, especially since there was evidence that they were not enforced. For these reasons, we hold that the Commission's finding was not against the manifest weight of the evidence.

The respondent next argues that the decedent's intoxication barred the recovery of death benefits as a matter of law. It contends that the decedent's death either arose out of the intoxication, or the intoxication was of such a degree that it constituted a departure from his employment.

■ Intoxication is not a *per se* bar to workers' compensation benefits. (*Riley v. Industrial Comm'n* (1991), 212 Ill. App. 3d 62, 570 N.E.2d 887.) For compensation to be denied on the basis of intoxication, the evidence must show that the employee was so intoxicated that the court can say as a matter of law that the injury arose out of his drunken condition and not out of his employment. (*Paganelis v. Industrial Comm'n* (1989), 132 Ill. 2d 468, 548 N.E.2d 1033; *Riley v. Industrial Comm'n* (1991), 212 Ill. App. 3d 62, 570 N.E.2d 887.) Whenever an employee is so drunk and helpless that he can no longer follow his employment, and he is injured in that condition, his injury does not arise out of his employment. However, intoxication which does not incapacitate the employee from following his occupation is not sufficient to defeat the recovery of compensation even though the intoxication may be a contributing cause of his injury. *District 141, International Association of Machinists & Aerospace Workers v. Industrial Comm'n* (1980), 79 Ill. 2d 544, 404 N.E.2d 787.

Resolving disputes in the evidence and drawing reasonable inferences and conclusions therefrom is the responsibility of the Industrial Commission. (*County of Cook v. Industrial Comm'n* (1988), 177 Ill. App. 3d 264, 532 N.E.2d 280.) The Commission's findings will not be reversed on appeal unless they are against the manifest weight of the

evidence. *Glover v. Industrial Comm'n* (1985), 140 Ill. App. 3d 361, 485 N.E.2d 605.

■ In the instant case, Dr. Schaffer opined that the decedent was intoxicated. However, he also stated that a person's level of tolerance for alcohol would affect whether he could perform certain tasks. Schaffer admitted that he did not know the decedent's tolerance for alcohol.

Additionally, McDaniels testified that on occasion the decedent would come to work and tell McDaniels that he had been drinking. McDaniels would watch the decedent closely and noted that he was able to perform his work. While four beer cans were found in the furnace with the decedent's body, McDaniels stated that there were often empty beer cans in the furnace area. Also, none of the witnesses who last saw the decedent noticed the smell of alcohol or anything unusual about him.

We find that the evidence in the instant case was such that the Commission could have reasonably inferred that the decedent's death did not arise out of intoxication and that he was not so intoxicated that it constituted a departure from his employment. Accordingly, the Commission's conclusion was not against the manifest weight of the evidence.

■ Finally, the respondent contends that the circuit court improperly excluded the decedent's medical records from evidence. Specifically, it argues that the decedent's hospital records relating to his treatment in a detoxification program should have been admitted into evidence. At arbitration, the respondent argued that the records were relevant to show the decedent's alleged lifelong problem with drinking. Before the circuit court, the respondent also argued for the first time that the records were relevant to the issues of the decedent's tolerance for alcohol and his hearing condition.

An arbitrator's decision should not be reversed based on contentions not presented to him and raised for the first time on appeal. Failure to raise issues before the arbitrator results in their waiver. *Thomas v. Industrial Comm'n* (1980), 78 Ill. 2d 327, 399 N.E.2d 1322.

Initially, we note that we agree with the arbitrator's ruling that the records were irrelevant to the issue of whether the decedent was drunk at the time he died. Furthermore, the petitioners' attorney stipulated that the decedent had undergone a hospital detoxification program 10 months prior to his death. Therefore, the arbitrator was aware that the decedent had a drinking problem in his past.

Additionally, we hold that since the respondent's other bases for admission of the records were never presented to the arbitrator they

are waived and the circuit court was correct in not considering them on appeal.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MCCULLOUGH, P.J., and WOODWARD, LEWIS, and RAKOW-SKI, JJ., concur.