LAKESIDE ARCHITECTURAL METALS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Laurie Schneider, Widow of Mark Schneider, Deceased, Appellee).

First District (Industrial Commission Division) No. 1—94—0243WC

Opinion filed October 28, 1994.

Roddy, Power, Leahy, Guill, Zima & Gifford, Ltd., of Chicago (John P. Roddy and John H. Guill, of counsel), for appellant.

Anesi, Ozmon & Rodin, Ltd., of Chicago (Arnold G. Rubin and Michelle L. DeKalb, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

The employer, Lakeside Architectural Metals, appeals from an order of the circuit court of Cook County which confirmed a decision of the Illinois Industrial Commission (Commission) awarding benefits to the claimant, Laurie Schneider, widow of the deceased employee, Mark Schneider (Mark).

On appeal, the employer raises several contentions which can be consolidated into the following issues: whether the Commission's decision that the accidental injuries resulting in Mark's death arose out of and in the course of his employment was against the manifest weight of the evidence and whether the Commission erred in admitting OSHA records into evidence.

By way of background, Mark had worked for the employer since 1979 and at the time of his death was a caulking superintendent. As part of his duties, he trained other employees on how to work on scaffolding. On April 20, 1991, Mark was killed when he fell 48 stories between the scaffolding and the building he was working on.

Kevin Hemp, who was working with Mark on the day of the accident, testified that Mark and he were caulking windows on the 48th floor of a condominium building. They had started about 7 a.m. The procedure to access the scaffold was to place the window at a 45 degree angle and slide out feet first until the feet touched the scaffold and then climb out the rest of the way. Once out, the workers would attach their safety belts.

According to Kevin, at about 11:30 a.m. on April 20, 1991, Mark and he went to a McDonald's restaurant for lunch. They returned around 12:15 p.m., at which time Mark pulled out a marijuana cigarette; they each took about 10 puffs from it. About 12:30 p.m., Mark and he returned to work. Kevin observed that Mark appeared "different" in that he was smiling. Kevin acknowledged that he was "high" and did not notice anything about Mark. He thought that Mark was "high too" because they had smoked the same amount.

About 12:30 p.m., Mark and he arrived back at the 48th floor to continue work. Kevin crawled out of the window and onto the

scaffolding; he admitted being a little scared. There was a gap between the building and the scaffolding. Mark handed him a five-gallon bucket containing caulk through the window and then attempted to climb through the window onto the scaffolding. Kevin, whose back was turned, heard a sound like shoes scuffling or scraping. He turned around to see Mark's body going between the scaffolding and the building; then he saw Mark strike the pavement below.

Kevin acknowledged that, initially, he did not tell the police the same version of the accident as he was now testifying to.

On cross-examination, Kevin testified that the safety belts were tied on after the workers were on the scaffolding. On the morning of the accident, the scaffolding was attached to the building with wire so that the wind did not blow the scaffold around.

The marijuana cigarette that Mark and he smoked was three inches in length and one-fourth of an inch in circumference. It took 5 to 10 minutes to smoke it.

Kevin did not remember whether he himself had any trouble accessing the scaffolding after lunch. He admitted he did not have a good recollection of the events from the lunch break until Mark's accident. He was not sure about the size of the marijuana cigarette. The safety belts could be reached from inside the building.

Jesse Ortiz, a marble helper, testified that he was working in the same building as Mark and Kevin on April 20, 1991. He observed Mark caulking on the scaffolding about six or seven times on the morning of the accident. He did not notice anything unusual about Mark. He also spoke to him and noticed nothing unusual about his speech, his face or his eyes. He also saw Mark one time after lunch at approximately 12:40 p.m. on that date. He observed nothing unusual about him at that time. They spoke for about four to five minutes. Mark spoke just like he had that morning. Jesse observed no difference in Mark between the morning and the afternoon of April 20, 1991.

Jesse further testified that following Mark's fall, he went to the window and observed the safety belt dangling in the wind. He also observed a 12- to 24-inch gap between the scaffolding and the building.

On cross-examination, Jesse testified that in their conversation after lunch, Mark had told him that he had smoked marijuana at lunch.

Stanley Bakshy, a clinical biochemist and toxicologist, testified that once marijuana has been ingested, the reaction time is anywhere from seconds to minutes. Marijuana is a hallucinatory drug. It causes hallucinations and affects equilibrium, judgment and depth

perception. In response to a hypothetical question based upon the circumstances surrounding Mark's fall, Bakshy was of the opinion that the inhalation of a marijuana cigarette 15 to 30 minutes prior to the accident would result in the individual being impaired and intoxicated with respect to his surroundings and the performance of his duties. According to Bakshy, most marijuana cigarettes contain 20 to 30 milligrams of THC (tetrahydrocannabinol), the active ingredient in marijuana that produces hallucinations.

On cross-examination, Bakshy agreed that there are no legal standards in Illinois for determining the intoxication level of marijuana. He acknowledged that different types of marijuana would have different levels of THC but had no knowledge as to whether different parts of a marijuana plant had different THC concentrations or whether the age of the cigarette affected the THC levels. He did not know the exact THC content of the marijuana cigarette smoked by Mark and Kevin, but he could extrapolate the level.

According to Bakshy, any direct ingestion of THC into the system causes intoxication. Even given the fact that no information was available as to the content of the marijuana cigarette smoked by Mark or as to whether the puffs he took on it were long or short or whether he actually inhaled the smoke, Bakshy stated that his opinion would not change. He acknowledged that he had never previously in giving an opinion relied on the testimony of a witness who admitted to being high himself.

On redirect examination, Bakshy described "being high" as the absence of normal inhibitions and standards. The effects vary between individuals. "Getting high" takes seconds to a minute and a half and can last two to four or five hours.

On re-cross-examination, Bakshy testified that there was some amount, between 20 and 30 milligrams, of THC in each marijuana cigarette although he acknowledged he did not know the exact contents of the one Mark smoked. He agreed that the tolerance level would vary between individuals. However, he thought it highly improbable that there would be an intoxication level reached with no impairment to job performance. In terms of marijuana, there was no difference between intoxication and impairment because, unlike in the case of alcohol, there are no standards to differentiate between the two. The tolerance level depends on the frequency, the amount of inhalation and the individual's constitutional makeup; some people may be more impaired or more exaggerated in response than others. The hypothetical question posed to him did not contain any evidence as to the subject's level of tolerance or the exact THC level, but the latter could be extrapolated.

On further redirect examination, Bakshy testified that although intoxication from marijuana would affect depth perception, he would not know whether it would have had any effect given the fact that Mark accessed the scaffolding feet first.

Dr. Jeffrey Coe, board certified in occupational medicine, testified that intoxication refers to the taking of a substance with potent toxicity within the body itself. In the instant case, impairment refers to a change of function, caused by toxic chemicals or by chemical ingestion, such as the ability to walk a straight line, balance, etc. While intoxication refers solely to a physiological event of taking material inside the body, it may or may not be connected to impairment or the functional change. There are no legal standards relative to intoxication levels or statutory presumptions as to impairment applicable to marijuana.

According to Dr. Coe, there are many factors that can alter the THC factor in a marijuana cigarette, such as: temperature, humidity, and conditions of storage; also, this factor depends upon the species of the plant and conditions of growth and harvesting. Since THC is distributed unevenly through the plant, there would be different levels of THC in different portions of the plant. There is no standard level of THC in illicit marijuana cigarettes; hence, there would be no presumption that any marijuana cigarette has between 20 to 30 milligrams of THC in it. With the ingesting of approximately 25 milligrams per kilogram of THC, there can be a relatively rapid development of intoxication which in some individuals produces impairment in the form of euphoria, i.e., high spirits or smiling. Physiological changes, such as redness of the eyes, increase in pulse rate and sweating, can also occur.

In response to a hypothetical question based upon the circumstances surrounding Mark's accident, Dr. Coe opined that Mark was likely to have been intoxicated, i.e., that he inhaled marijuana smoke which was absorbed through his lungs. Dr. Coe further opined that Mark was not impaired as he attempted to access the scaffolding immediately prior to his accident. Dr. Coe based his opinion on the lack of evidence of any physiological changes in Mark; he was able to walk to the window and had hand-eye coordination to hand a five-gallon bucket to his co-worker. Dr. Coe found no evidence of actual impairment in the hypothetical question posed. Dr. Coe found no evidence that Mark was unable to perform his job functions. The fact that Mark's co-worker, Kevin Hemp, stated that both Mark and he were "high" made no difference to his opinion. The term "high" has no scientific meaning, and the doctor would have no way of knowing what the individual meant by it. It would not be the customary

practice in toxicology to rely on the testimony of an individual who was himself "high" at the time of the accident.

On cross-examination, Dr. Coe testified that ingestion of marijuana depends on the depth of inhalation. There is a delay between intoxication and impairment since the drug has to be distributed throughout the body, particularly to the brain and other organs. Some impairment should be present after about five minutes after intoxication, if any is going to occur. The fact that Mark was able to perform his duties (accessing the scaffolding successfully) prior to ingesting the marijuana but not afterwards did not indicate impairment, since it appeared from the OSHA records that the working conditions were inherently hazardous. Thus, even if there was impairment, it played no part in the accident.

While Dr. Coe conceded that inhaling a marijuana cigarette some 10 times, even though the THC level was unknown, could cause impairment, he also stated that it also could cause improvement in certain tasks requiring concentration or perception. The fact that Mark was an instructor on the use of scaffolding did not lead him to conclude that Mark was impaired prior to his accident.

Dr. Coe further testified that chronic marijuana smokers tend to absorb THC more efficiently from inhaled smoke but also tend to excrete it more quickly, so that there is a physiological alteration. They tend to experience the early behavioral changes associated with ingestion more rapidly than inexperienced smokers of the drug.

On redirect examination, Dr. Coe testified that in a study done on the effect of marijuana on driving capabilities, some individuals actually improved their performance while under the influence of marijuana but that the effect was bidirectional, *i.e.*, could go either way. According to Dr. Coe, 10 inhalations from a marijuana cigarette may produce little absorption depending on how the individual is actually smoking the cigarette.

On re-cross-examination, Dr. Coe maintained that the fact that Mark was an instructor in the use of scaffolds and did not attach his safety belt before attempting to access the scaffold did not necessarily indicate that Mark was impaired because of the ingestion of marijuana.

Among the records admitted into evidence were OSHA records relating to the investigation of the accident and the autopsy report, which revealed that no ethanol or opiates were present in Mark's blood; however, there was insufficient quantity of blood to test for the presence of THC.

The arbitrator awarded benefits, finding that Mark's death was causally connected with his employment. The arbitrator found Kevin

Hemp's testimony to be inconsistent and not credible. Assuming that Mark had ingested marijuana on the day of the accident, the arbitrator adopted the opinion of Dr. Coe that Mark was not impaired and rejected the opinion of Mr. Bakshy as not credible, based upon his failure to acknowledge basic principles of scientific knowledge relating to marijuana. On review, the Commission adopted the decision of the arbitrator and affirmed the award of benefits to the claimant. On further review, the circuit court confirmed the award of benefits. The employer now brings this appeal.

The employer contends, first, that the award of benefits in this case is improper since the use of marijuana in the workplace is against the law and the public policy of this State. The employer acknowledges that this is a case of first impression but refers this court to *Profice v. Board of Review of the Illinois Department of Labor* (1985), 135 Ill. App. 3d 254, in which case a worker was denied unemployment benefits due to dismissal from her employment for smoking marijuana on the job. However, a careful reading of that decision reveals that the employee had violated a specific rule of the employer prohibiting the use or possession of intoxicating liquor or narcotics of any kind during the work day. The fact that marijuana was an illegal substance was not a deciding factor in the case.

The employer relies on cases from other jurisdictions (Texas, South Dakota, Oregon) in which the use of marijuana defeated claims for benefits. However, in each of those cases, either by statute or case law, employees were denied benefits where their injuries resulted from intoxication.

The Illinois Workers' Compensation Act (Act) (Ill. Rev. Stat. 1991, ch. 48, par. 138.1 *et seq.* (now 820 ILCS 305/1 *et seq.* (West 1992))) does not preclude recovery merely on the basis of intoxication caused by the ingestion of legal or illegal substances. (See *Paganelis v. Industrial Comm'n* (1989), 132 Ill. 2d 468, 481 ("Unlike the majority of States, Illinois has no statute specifically recognizing intoxication as a defense to a workers' compensation claim or as grounds for a reduction in workers' compensation benefits").) In *District 141, International Association of Machinists & Aerospace Workers v. Industrial Comm'n* (1980), 79 Ill. 2d 544, our supreme court stated as follows:

> "In order for compensation to be denied on the basis that an employee was intoxicated, 'the employee must be so intoxicated, as shown by the evidence, that the court can say, as a matter of law, that the injury arose out of his drunken condition and not out of his employment.' [Citations.] Whenever an employee is so drunk and helpless that he can no longer follow his employment

he cannot be said to be engaged in his employment, and when injured in that condition his injury does not arise out of his employment. But intoxication which does not incapacitate the employee from following his occupation is not sufficient to defeat the recovery of compensation although the intoxication may be a contributing cause of his injury. Our statute was not designed to make contributory negligence of the employee, or a defense of that nature, a bar to his recovery under the [Act], where, as in this case, his injury arose out of and in the course of his employment." 79 Ill. 2d at 557-88.

We believe that the above statements apply even in a situation, such as the present one, where the employee ingested an illegal substance. In *County of Cook v. Industrial Comm'n* (1988), 177 Ill. App. 3d 264, the employee and a co-worker, while on their lunch hour, purchased and consumed beer during their lunch. Later that afternoon, the truck in which the employee was a passenger was involved in an accident, and the employee was injured. The employer contended, *inter alia*, that the employee was not entitled to benefits because he was intoxicated as shown by his blood-alcohol level, which was 0.25. The employer argued that since there was a legal presumption of intoxication when a person has a 0.10 blood-alcohol level under the Illinois Vehicle Code (Ill. Rev. Stat. 1983, ch. 95$^1$/2, par. 11—501.2(b)(3)) and since the employee's blood-alcohol level was in excess of the statutory level, his intoxication should defeat recovery.

The reviewing court rejected the employer's argument that the standard of the Illinois Vehicle Code should apply and reiterated that the applicable standard was whether the employee was so intoxicated that he cannot perform his occupational tasks. *County of Cook*, 177 Ill. App. 3d 264.

■ We hold, therefore, that the mere fact that the employee has ingested an illegal substance at the time of his injury will not, in and of itself, defeat a claim for benefits.

The employer also contends that the Commission erred in determining that Mark's death arose out of and in the course of his employment.

An injury is compensable under the Act only if it arises out of and in the course of employment. (*Kropp Forge Co. v. Industrial Comm'n* (1992), 225 Ill. App. 3d 244, 249.) For an injury to arise out of one's employment, it must have an origin in some risk connected with or incidental to the employment so that there is a causal connection between the employment and the injury. (*Kropp Forge Co.*, 225 Ill. App. 3d at 249-50.) An injury is in the course of employment when it occurs within the period of employment at a

place where the employee can reasonably be expected to be in the performance of his duties and while he is performing those duties or something incidental thereto. (225 Ill. App. 3d at 250.) Resolving disputes in the evidence and drawing reasonable inferences and conclusions therefrom are the responsibility of the Industrial Commission, and the Commission's findings will not be reversed on appeal unless they are against the manifest weight of the evidence. 225 Ill. App. 3d at 251-52.

If an employee voluntarily and in an unexpected manner exposes himself to a risk outside any reasonable exercise of his duties, a resulting injury will not be within the course of his employment unless the employer had knowledge of or acquiesced in such unreasonable conduct. (*Sekora v. Industrial Comm'n* (1990), 198 Ill. App. 3d 584, 590.) The employer argues that it did not condone the use of marijuana in the workplace and that Mark increased the job risk by ingesting marijuana as proved by the fact that he fell to his death. However, our supreme court, quoting Professor Larson, pointed out:

> " 'Voluntary intoxication which renders an employee incapable of performing his work is a departure from the course of employment. Otherwise, apart from special statute, evidence of intoxication at the time of injury is ordinarily no defense, at least unless the intoxication was the sole cause of injury.' [Citation.]" *Paganelis*, 132 Ill. 2d at 480-81.

We are of the opinion that there was sufficient evidence in the record for the Commission to determine that, assuming Mark ingested marijuana, it was not the sole cause of his fall from the scaffold. Mark's blood was not tested for the presence of THC following his death. The only admissible testimony as to Mark's consumption of marijuana came from his co-worker, Kevin Hemp, who admitted to also ingesting marijuana, and Jesse Ortiz, who testified that Mark told him he had smoked marijuana that day. The Commission, in adopting the arbitrator's decision, specifically found Kevin's testimony to be inconsistent and not credible. There was also testimony from Ortiz that he detected no change in Mark's appearance or manner after lunch. Therefore, there was a basis in the record for the Commission to reject the contention that Mark even ingested any marijuana.

■ An employee need not prove that some act or phase of the employment was the sole causative factor or even the principal causative factor, only that it was a causative factor. (*Material Service Corp., Division of General Dynamics v. Industrial Comm'n* (1973), 53 Ill. 2d 429, 434.) Even assuming Mark inhaled a marijuana cigarette, there was sufficient evidence from which the Commission could

determine that Mark was not rendered incapable of performing his duties. The Commission found the testimony of Mr. Bakshy, the employer's expert, not to be credible for reasons set forth earlier and chose to adopt the opinion of Dr. Coe who, based upon the hypothetical question posed to him, concluded that Mark was not impaired from performing his job functions. The OSHA records of the investigation following Mark's accident indicated that as a result of unsafe working conditions, the employees were exposed to fall hazards in the use of the scaffolding. Jesse Ortiz in fact testified that after Mark fell, he observed a 12- to 24-inch gap between the building and the scaffolding. He also observed a safety belt dangling. Kevin Hemp testified that the workers did not put on their safety belts until they were on the scaffolding.

In sum, based upon the evidence in the record, the Commission could properly have determined that, even assuming Mark had ingested marijuana, his fall and subsequent death were not the result of or not solely caused by his ingestion of marijuana, but rather the result of the unsafe procedures used in accessing the scaffolding on which he was working.

■ Finally, the employer contends that the OSHA records should not have been admitted into evidence. However, no authority is cited in support of this argument, and, therefore, it is waived. (137 Ill. 2d R. 341 (e)(7).) Nevertheless, even without the OSHA records, we are of the opinion that, given the testimony of Kevin Hemp and Jesse Ortiz as to the scaffold and its use in this case, there was sufficient evidence in the record to support the Commission's decision.

The judgment of the circuit court is affirmed.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI, SLATER, and RARICK, JJ., concur.